Argued and submitted April 27; trial court order dismissing claims affirmed, remanded August 10, 2022

Sonja BOHR,
Tamara Barnes, Karen Foglesong,
and Mary Wood, on behalf of themselves
and all others similarly situated,
*Plaintiffs-Respondents,*

*v.*

TILLAMOOK COUNTY CREAMERY ASSOCIATION,
an Oregon cooperative corporation,
*Defendant-Appellant.*

Sonja BOHR,
Tamara Barnes, Karen Foglesong,
and Mary Wood, on behalf of themselves
and all others similarly situated,
*Plaintiffs-Appellants,*

*v.*

TILLAMOOK COUNTY CREAMERY ASSOCIATION,
an Oregon cooperative corporation,
*Defendant-Respondent.*

Multnomah County Circuit Court
19CV36208; A175575

516 P3d 284

In this putative class action asserting claims under Oregon's Unfair Trade Practices Act, plaintiffs appeal a trial court order that granted in part defendant's motion to dismiss. On appeal, plaintiffs contend that the trial court erred because, given the nature of their claims, they were not required to plead reliance. *Held*: The trial court did not err. The complaint asserted a "price inflation" theory of causation of injury, which, given the allegations in the complaint and the products at issue in this case, was not a viable theory. The complaint also asserted an inducement theory of causation. That theory required plaintiffs to plead reliance. Finally, the complaint asserted what plaintiffs characterized as prohibited transaction claims. Given the nature of the unlawful trade practice at issue and the ascertainable loss asserted with respect to plaintiffs' prohibited transaction claims, plaintiffs' prohibited transaction claims required them to plead reliance.

Trial court order dismissing claims in part affirmed; remanded.

Kelly Skye, Judge.

Amanda Howell, Texas, argued the cause for Sonja Bohr, Tamara Barnes, Karen Fogelsong, and Mary Wood. Also on the briefs were David F. Sugerman, Nadia H. Dahab, and Sugerman Law Office, Tim Quenelle and Tim Quenelle PC, Kelsey Eberly, California, and Animal Legal Defense Fund.

Michael J. Sandmire argued the cause for Tillamook County Creamery Association. Also on the opening and answering briefs were Alexandra M. Shulman, Daniel L. Lis, and Buchalter Ater Wynne. Also on the reply brief were Alexandra M. Shulman and Buchalter Ater Wynne.

Before Tookey, Presiding Judge, and Lagesen, Chief Judge, and DeVore, Senior Judge.

TOOKEY, P. J.

Trial court order dismissing claims affirmed; remanded.

## TOOKEY, P. J.

Plaintiffs brought this putative class action under Oregon's Unlawful Trade Practices Act (UTPA) against defendant, Tillamook County Creamery Association (Tillamook), on behalf of themselves and on behalf of all "persons in Oregon who purchased Tillamook dairy products in Oregon" during the one-year period preceding the date that their complaint was filed. Plaintiffs' complaint asserts that Tillamook engaged in practices prohibited by the UTPA. More specifically, plaintiffs' complaint asserts that "Tillamook has engaged in a deceptive marketing campaign to convince consumers that the dairy cows who provide milk for its products graze on pastures in Tillamook County" and deceptively represented to consumers that Tillamook's "products are sourced from small family farms whose traditional farming practices are better for the environment, the local community, and of course the cows than are the industrial dairy facilities that Tillamook derides as 'Big Food.'" Plaintiffs' complaint included both a "price-inflation" theory of causation, as well as an "inducement" theory of causation, and what plaintiffs characterize as "prohibited transaction" claims.

Tillamook moved to dismiss the complaint for the reason, among others, that the named plaintiffs and the putative class members had not pleaded reliance. Tillamook argued, among other points, that plaintiffs could not avoid pleading reliance by alleging "a non-cognizable 'price-inflation' theory" or by characterizing their UTPA claims against Tillamook as "prohibited transaction" claims. The trial court granted Tillamook's motion to dismiss in part and denied it in part. In the trial court's view, although the complaint adequately pleaded reliance with regard to the named plaintiffs, it did not do so with regard to the putative class. That putative class, as the trial court observed, included individuals who purchased Tillamook products "without ever having observed any Tillamook marketing." The trial court directed that the class be limited to consumers who had purchased Tillamook products in reliance on Tillamook's marketing representations described in plaintiffs' complaint. The trial court further dismissed plaintiffs' claims—both those of the named plaintiffs and those of

the putative class—that were "based on a price inflation or fraud on the market theory," and plaintiffs' claims that were based on a "prohibited transaction" theory.

In its order granting in part and denying in part Tillamook's motion to dismiss, the trial court certified seven controlling questions of law for interlocutory review by this court pursuant to ORS 19.225 (five from plaintiffs and two from Tillamook).[1] The parties then separately applied for leave to appeal the trial court's order. We granted both plaintiffs' and Tillamook's applications for interlocutory appeal.

As explained below, plaintiffs' first two assignments of error correspond to four of the controlling questions certified by the trial court. In plaintiffs' first assignment of error, plaintiffs assert that the trial court "erred in granting Tillamook's motion to dismiss on the ground that plaintiffs and members of the putative class were required to plead and prove that they observed and relied upon defendant's representations." In plaintiffs' second assignment of error, plaintiffs assert the trial court "erred in granting Tillamook's motion to dismiss on the ground that plaintiffs and members of the putative class were required to plead and prove that they relied upon defendant's representations with respect to their prohibited transaction claims." For the reasons described below, we reject plaintiffs first two assignments of error, affirm the trial court's rulings on Tillamook's motion to dismiss as to those issues, and we remand for further proceedings consistent with this opinion.

Further, as explained below, our resolution of plaintiffs' first two assignments of error functionally resolve the claims of the putative class. Having resolved the claims

---

[1] ORS 19.225 provides:

"When a circuit court judge, in making in a class action under ORCP 32 an order not otherwise appealable, is of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, the judge shall so state in writing in such order. The Court of Appeals may thereupon, in its discretion, permit an appeal to be taken from such order to the Court of Appeals if application is made to the court within 10 days after the entry of the order. Application for such an appeal shall not stay proceedings in the circuit court unless the circuit court judge or the Court of Appeals or a judge thereof shall so order."

of the putative class, mindful that interlocutory appeals in class actions under ORS 19.225 should be reserved for "exceptional cases," *Pearson v. Philip Morris, Inc.*, 208 Or App 501, 514, 145 P3d 298 (2006) (*Pearson I*), and that our review under ORS 19.225 is discretionary, we decline to address the remaining questions certified for interlocutory appeal. As we will explain, resolution of the remaining issues presented in this interlocutory appeal would apply to only the named plaintiffs, and there are prudential reasons not to reach them.

## I. BACKGROUND

"We review the grant of a motion to dismiss for failure to state a claim under ORCP 21 A(8) for legal error."[2] *Rivas v. Board of Parole*, 277 Or App 76, 78, 369 P3d 1239 (2016), *rev den*, 360 Or 752 (2017). In doing so, we accept as true the allegations in plaintiffs' second amended complaint—the operative complaint in this case—as well as any reasonable inferences that may be drawn, viewing them in the light most favorable to the nonmoving party. *Id.* We state the facts in accordance with that standard.

### A. *Tillamook and Its Marketing*

Tillamook is an Oregon cooperative corporation that does business in Oregon and across the United States. In 2017, Tillamook's revenue attributable to its dairy products was $800 million. According to plaintiffs, Tillamook has engaged in a deceptive marketing campaign: Per plaintiffs' complaint, "Tillamook's marketing deceptively claims its dairy products are (1) sourced (exclusively) from dairy farms located in Tillamook County, (2) made using production practices that closely resemble small-scale traditional farming, and (3) from cows allowed to graze on pasture and treated better than those on factory farms." According to plaintiffs, those deceptive claims are made through Tillamook's "website, in print and television advertisements, and across social media platforms."[3]

---

[2] ORCP 21 A(8) was renumbered as ORCP 21 A(1)(h), effective January 1, 2022. We cite the former version in this opinion.

[3] We note that plaintiffs' complaint also asserted, with regard to plaintiffs' allegations concerning misrepresentation of the geographic location of the origin of Tillamook products, that "deceptive representations about the geographic

According to plaintiffs' complaint, in reality, contrary to Tillamook's marketing representations, Tillamook "sources upwards of two thirds of the milk for its products from the largest and most industrialized dairy factory farm in the country—a Concentrated Animal Farming Operation ('CAFO') with over 70,000 total cows and 32,000 dairy cows confined in a single location." The CAFO is not located in Tillamook County but, instead, in eastern Oregon. Plaintiffs allege that the CAFO consists of a "complex of cement-floored production facilities and barren dirt feedlots, where cows are continuously confined, milked by robotic carousels, and afflicted with painful udder infections," and is "a far cry from the rolling green hills of the Tillamook County family farms shown throughout Tillamook's marketing campaign."

B.   *Consumer Behavior*

Plaintiffs' complaint also contains allegations concerning consumer behavior. According to the complaint, consumers "increasingly seek out and are willing to pay more for products that they perceive as being ecofriendly, such as 'free range,' 'cage free,' 'organic,' 'sustainable,' 'local,' 'grass fed' and other terms that lead reasonable consumers to conclude they are supporting local and ethical businesses." Consumers do so because they "believe such sellers are better for the environment, more humane." Consumers also "seek out products made by small-scale farmers in order to support non-industrialized farming, to eschew products that contribute to corporate control of the food system, and support products that are environmentally sustainable."

According to plaintiffs' complaint, Tillamook has falsely projected "such ethical sourcing as its company ethos, deliberately crafting its marketing messages to attract these consumers, who believe they are getting such responsibly sourced products when they buy Tillamook cheese and ice cream." The complaint also alleges that Tillamook's marketing "is highly effective at convincing consumers that its dairy products are sourced from smaller, pasture-based dairies in

---

origin appear *** [on Tillamook] product packaging." After an earlier motion to dismiss filed by Tillamook, the trial court ruled that the representations on the labeling on Tillamook product packaging cannot serve as an independent basis for a UTPA claim.

Tillamook County that prioritize animal welfare and environmental stewardship more than large, industrial dairies do."

C.  *The Named Plaintiffs*

Plaintiffs' complaint was filed by four named plaintiffs. Each of the four named plaintiffs alleges that, "having seen the Tillamook representations," each plaintiff thought that "she was purchasing a product that aligned with her values" and that, had each named plaintiff known the truth about Tillamook's products, "she would have bought other dairy products instead of Tillamook's, or would not have paid as much as she did for the Tillamook products." The complaint further alleged that each of the named plaintiffs "regularly seeks out, and is willing to pay more for, dairy products that she perceives as being more humane and coming from small, pasture-based dairies."

D.  *The Putative Class & Class Causation*

In their complaint, plaintiffs seek to represent, with certain exceptions not relevant here, a class comprising "all persons in Oregon who purchased Tillamook dairy products in Oregon" in the year prior to the filing of the complaint. Regarding the causation of injury, the complaint specified, "Because, like Plaintiffs, all Class Members paid more for Tillamook products than they otherwise would have had Tillamook not falsely marketed them, or bought Tillamook products when they otherwise would not have (and would have instead purchased other dairy products that *do* have the benefits that Tillamook claimed its products have), the injuries to each Class Member were caused directly by Tillamook's illegal conduct." (Emphasis in original.) Plaintiffs' complaint did not allege, however, that each class member had relied on, or even observed, Tillamook's alleged misrepresentations.[4]

E.  *Claims for Relief*

As relevant to this appeal, plaintiffs' complaint alleged that Tillamook's marketing caused a likelihood

---

[4] As noted above, the trial court observed that the putative class, as described in the complaint, included individuals who purchased Tillamook products "without ever having observed any Tillamook marketing." The accuracy of that observation is not challenged by plaintiffs on appeal.

of confusion or misunderstanding in violation of ORS 646.608(1)(b)—specifically, a likelihood of confusion or misunderstanding that Tillamook (1) "sources its dairy products from small family farms," (2) "sources its dairy products from Tillamook County," and (3) "sources its dairy products from farms that prioritize animal welfare." The complaint also alleged that Tillamook violated ORS 646.608(1)(d) "by using deceptive representations or designations of geographic origin in connection with goods," and violated ORS 646.608(1)(e) "by representing that goods had qualities or characteristics that they did not have."[5]

With regard to the alleged "ascertainable loss" suffered as a result of Tillamook's alleged marketing practices, among other points, plaintiffs' complaint alleged what we understand to be a "price-inflation" theory of loss:

"Plaintiffs and the class purchased goods at an inflated price based upon the represented increased economic market value of those products as a result of Tillamook's successful marketing that created widespread likelihood of confusion or misunderstanding and allowed Tillamook to charge a premium for its dairy products, and as a result plaintiffs and members of the class paid more than they otherwise would have paid for Tillamook dairy products."

It also alleged what we understand to be an "inducement" theory of loss:

"Plaintiffs and the class paid higher prices for Tillamook's dairy products because of their understanding that the

---

[5] ORS 646.608 provides, in relevant part:

"(1) A person engages in an unlawful practice if in the course of the person's business, vocation or occupation the person does any of the following:

"* * * * *

"(b) Causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of real estate, goods or services.

"* * * * *

"(d) Uses deceptive representations or designations of geographic origin in connection with real estate, goods or services.

"(e) Represents that real estate, goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, quantities or qualities that the real estate, goods or services do not have or that a person has a sponsorship, approval, status, qualification, affiliation, or connection that the person does not have."

dairy products all came from the small family farms with increased priority of animal welfare in Tillamook County and the Tillamook County Creamery Association, located in Tillamook."

Finally, plaintiffs' complaint alleged a theory of loss that plaintiffs characterize as "prohibited transaction" claims:

"Plaintiffs and the class purchased 'misbranded goods' as defined by 21 CFR 101.18 (False Statement of Geographic Origin). The sale of misbranded goods are prohibited by 21 USC Sec 331. Because defendant was prohibited from selling misbranded goods by federal law, plaintiffs and the class seek damages based upon the purchase price for those illegal products.

"* * * Defendant disseminated a false advertisement as defined by ORS 616.215(5) which is prohibited by ORS 616.265 and ORS 616.270. Because defendant was prohibited from advertising its products by state law plaintiffs and the class seek damages based upon the purchase price for those illegally advertised products."[6]

Plaintiffs' complaint sought to demonstrate that Tillamook's "illegal marketing and sales prices have lead

---

[6] 21 CFR section 101.18(c) defines a "food misbranded" to include any food accompanied by any "representation that expresses or implies a geographical origin of the food or any ingredient of the food," except when, among other exceptions, such representation is a "truthful representation of geographical origin.".

21 USC section 331(a) prohibits "[t]he introduction or delivery for introduction into interstate commerce of any food * * * that is adulterated or misbranded."

ORS 616.215(5) prohibits "[t]he dissemination of any false advertisement."

ORS 616.265 provides that "[a]n advertisement of a food shall be deemed to be false if it is false or misleading in any particular."

ORS 616.270 provides:

"If any article is alleged to be misbranded because the labeling is misleading, or if any advertisement is alleged to be false because it is misleading, then in determining whether the labeling or advertisement is misleading, there shall be taken into account, among other things, not only representations made or suggested by statement, word, design, device, sound or in any combination thereof, but also the extent to which the labeling or advertisement fails to reveal facts material in the light of such representations or material with respect to consequences which may result from the use of the article to which the labeling or advertisement relates under the conditions of use prescribed in the labeling or advertisement thereof or under such conditions of use as are customary or usual."

plaintiffs and members of the class to routinely pay more for Tillamook dairy products, as compared to national and generic brands" by including allegations that detailed the pricing difference between specific Tillamook products, on the one hand, and other brands of dairy products, on the other, as sold on August 10, 2019, and as advertised for sale on February 27, 2020. Those allegations reflect that on August 10, 2019, and on February 27, 2020, certain Tillamook products were more expensive than similar dairy products made by other brands, such as Kroger, Lucerne, Land O' Lakes, and Darigold.

Additionally, the allegations in plaintiffs' complaint reflect that on February 27, 2020, the same Tillamook products sold for different prices in different stores throughout Oregon. For example, on February 27, 2020, according to the complaint, Tillamook medium cheddar cheese, 16 ounce size, sold for $4.99 at the Fred Meyer in the Hollywood district of Portland, but $6.99 (40.0% more) at the Safeway in Beaverton; a Tillamook brand "small" yogurt sold for $0.79 at the Safeway in Beaverton, but $1.00 (26.6% more) at the Fred Meyer in the Hollywood district of Portland; and Tillamook brand butter sold for $4.89 at the "Mkt Fresh" in St. Helens, but $5.49 (12.3% more) at Safeway stores in St. Helens and Beaverton.

F.   *Tillamook's Motion to Dismiss*

As noted above, Tillamook moved to dismiss plaintiffs' complaint, contending, among other points, that the named plaintiffs and putative class had not pleaded reliance. Tillamook argued that plaintiffs and the putative class could not avoid pleading reliance by alleging a "price-inflation" theory—which Tillamook asserted was "non-cognizable"—or by characterizing their claims as being based on a "prohibited transaction theory." Plaintiffs, in response, contended that they were not required to plead reliance, and that they had properly pleaded ascertainable loss and causation as necessary to assert a UTPA claim.

The trial court granted in part and denied in part Tillamook's motion to dismiss. In the trial court's view, although the complaint adequately pleaded reliance with regard to the named plaintiffs, it did not do so with regard

to the putative class. That putative class, as the trial court observed, included individuals who purchased Tillamook products "without ever having observed any Tillamook marketing." The trial court further dismissed plaintiffs' claims that were "based on a price inflation or fraud on the market theory," noting that "no authority presented supports Plaintiffs' price inflation theory as plead[ed] in this complaint." The trial court also dismissed plaintiffs' claims that were based on a "prohibited transaction" theory. Finally, the trial court required that the class definition be limited to consumers who purchased Tillamook products in reliance on the Tillamook marketing representations that are the subject of the complaint, which we understand to be a conclusion as to what plaintiffs must show to establish causation on their inducement theory absent the viability of their "price inflation" theory and their "prohibited transaction" claims.

G.  *The Motions for Interlocutory Appeal*

After the trial court's ruling on Tillamook's motion to dismiss, plaintiffs moved for an amended order certifying the case for interlocutory appeal pursuant to ORS 19.225, proposing five "controlling questions" to certify to this court. Tillamook filed a cross-motion, seeking an amended order certifying the case for interlocutory appeal pursuant to ORS 19.225, and proposing two additional "controlling questions" to certify to this court. The trial court granted both plaintiffs' and Tillamook's motions, with some modifications to the questions, and plaintiffs and Tillamook separately applied to this court to be allowed to file an interlocutory appeal.

Those applications were granted, and both plaintiffs and Tillamook then separately briefed their appeals in accordance with the statutes and rules governing civil appeals. ORAP 10.05(8).[7]

---

[7] ORAP 10.05 provides the "practice and procedure governing applications to appeal from certain court orders involving questions of law under ORS 19.225." It further states that, if the "Court of Appeals allows an application under ORS 19.225, the notice of appeal and notice of cross-appeal are deemed filed as of the date of the order allowing the application" and "[t]he appeal shall then proceed in accordance with the statutes and rules governing civil appeals."

H.   *Questions Answered on Appeal and Plaintiffs' Assignments of Error*

As noted, the trial court certified seven controlling questions of law, five from plaintiffs and two from Tillamook. Plaintiffs and Tillamook separately applied for leave to appeal the trial court's order. We granted both plaintiffs' and Tillamook's applications for interlocutory appeal, and, in accordance with the statutes and rules governing civil appeals, the parties' briefing followed.

As noted above, in their first assignment of error, plaintiffs contend that the trial court erred in granting Tillamook's motion to dismiss "on the ground that Plaintiffs and members of the putative class were required to plead and prove that they observed and relied upon defendants' representations." In their second assignment of error, plaintiffs contend that the trial court erred in granting Tillamook's motion to dismiss "on the ground that Plaintiffs and members of the putative class were required to plead and prove that they relied upon Defendant's representations with respect to their prohibited transaction claims." Those two assignments of error correspond with four of plaintiffs' questions certified by the trial court and accepted by this court for interlocutory appeal:

"1.   For their claims alleging a violation of the Unlawful Trade Practices Act, ORS 646.608(1)(b), are Plaintiffs and the members of the putative class required to plead and prove that they observed and relied upon Defendant's representations?

"2.   For their claims alleging a violation of the Unlawful Trade Practices Act, ORS 646.608(1)(d), are Plaintiffs and the members of the putative class required to plead and prove that they observed and relied upon Defendant's representations?

"3.   For their claims alleging a violation of the Unlawful Trade Practices Act, ORS 646.608(1)(e), are Plaintiffs and the members of the putative class required to plead and prove that they observed and relied upon Defendant's representations?

"* * * * *

"5.   If Plaintiffs plead and prove that Defendant violated 21 USC Sec. 331 by selling 'misbranded goods' as defined in 21 CFR 101.18(c), or that Defendant disseminated a 'false advertisement' as prohibited by ORS 616.215(5) and as defined in ORS 616.265 or ORS 616.270, are Plaintiffs and the members of the putative class required to plead and prove reliance upon Defendant's representations for their claims that Defendant violated the Unlawful Trade Practices Act, ORS 646.608(1)(b), (1)(d), and (1)(e)?"

In this opinion, we answer those four questions "yes," and in doing so reject plaintiffs' first two assignments of error, and we affirm the trial court's rulings as to those limited issues. *Shea v. Chicago Pneumatic Tool Co.*, 164 Or App 198, 200, 990 P2d 912 (1999), *rev den*, 330 Or 252 (2000) (noting that under ORS 19.225, the "scope of our review is limited to the * * * controlling questions of law that the trial court identified as warranting resolution by interlocutory appeal").

Based on plaintiffs' application for interlocutory appeal, we understand our answer to those four questions— and our rejection of plaintiffs' first two assignments of error—to "functionally resolve the claims of members of the putative class."[8] That is, in this opinion, we conclude that the putative class needed to plead reliance to go forward with their claims. But, as the trial court determined, no class-wide reliance was pleaded—as the class included individuals who never observed Tillamook's representations— and the trial court's determination that the class did not plead reliance is not before us on appeal. And, so, because class-wide reliance was required to be pleaded but was not, we conclude that the trial court did not err in dismissing the claims of the putative class for failing to plead reliance, and we affirm that ruling. Therefore, with our conclusions

___

[8]  In plaintiffs' application to this court for leave to appeal, plaintiffs explained that three of the trial court's rulings on Tillamook's motion to dismiss "functionally resolved the claims of members of the putative class." Those rulings by the trial court, as characterized by plaintiffs, were (1) that, "to state a claim under ORS 646.608(1)(b), (d), or (e), Plaintiffs must plead and prove that Plaintiffs and members of the class observed and relied on Tillamook's marketing when they purchased Tillamook products," (2) that "Plaintiffs' claims based on a price inflation or fraud-on-the market theory are not cognizable in any respect," and (3) the court's dismissal with prejudice of "Plaintiffs' claims based on a prohibited-transaction theory arising out of violations of 21 U.S.C. § 331 and ORS 616.215(5)."

in this opinion, the claims of the putative class have been functionally resolved.

In addition to the four questions noted above which correspond to plaintiffs' first and second assignment of error, three additional questions were certified by the trial court. The following additional question (which has two parts, but we treat as one question) is raised in plaintiffs' interlocutory appeal:

"4.a   To establish ascertainable loss under ORS 646.638(1) based upon their theory that Plaintiffs and the members of the putative class overpaid for the Tillamook products compared to competing brands, must Plaintiffs and the members of the putative class plead and prove which Tillamook product(s) Plaintiffs and the members of the putative class purchased and at what cost, as well as the cost of the proper comparator product(s) available at the time of their respective purchases?

"4.b   If the answer to the foregoing question is 'no,' must Plaintiffs and the members of the putative class nonetheless plead and prove which Tillamook product(s) Plaintiffs and the members of the putative class purchased and at what cost in order to provide the basis for any 'inference' of ascertainable loss?"

The following two additional questions are raised in Tillamook's interlocutory appeal:

"(1)   Whether Plaintiffs' claim under ORS 646.608(1)(b) fails on the basis that the term 'source' in that subsection refers to the company that sells the goods at issue, not the geographic origin of an ingredient used to make the goods, and not the supplier of an ingredient used to make the goods.

"(2)   Whether Plaintiffs' claim under ORS 646.608(1)(b) fails on the basis that the meaning of 'goods' in that subsection does not include an ingredient used to make the goods, in this case, milk."

With our affirmation of the trial court's dismissal of the claims of the putative class for failure to plead reliance, our resolution of those remaining three questions certified by the trial court and accepted by this court (and the accompanying assignments of error), would, at this juncture,

provide answers that would affect only the named plaintiffs, not the putative class. That is because, as set forth above, our analysis in this opinion functionally resolves the claims of the putative class. It seems to us then that, although the three remaining questions were properly understood as controlling questions of law in a class action when certified by the trial court for interlocutory appeal under ORS 19.225 and accepted for review by this court, given our analysis with regard to plaintiffs' first two assignments of error, the remaining three questions certified for interlocutory appeal are, for all intents and purposes, no longer controlling questions in a class action. We decline to reach those three questions for two reasons.

The first reason is that interlocutory appeal of trial court orders in Oregon is the exception, not the rule. In particular, we have stated that interlocutory appeal under ORS 19.225 should be reserved for "exceptional cases." *Pearson I*, 208 Or App at 514. Given that, at this juncture, our resolution of the three remaining questions would only affect the named plaintiffs—not the putative class—the remaining questions do not seem to be the type of questions that the legislature had in mind when it allowed interlocutory appeal of controlling questions of law in class actions under ORS 19.225.

Relatedly, we also observe that, even if on remand plaintiffs endeavored to plead class-wide reliance, such that this case was again a putative class action, the class-wide-reliance-based claims might fail at the class certification stage because, in many circumstances, reliance may not be susceptible to classwide proof. *See Pearson v. Philip Morris, Inc.*, 358 Or 88, 133, 361 P3d 3 (2015) (*Pearson II*) ("[S]ustaining a class action where the claim requires a large number of individual members to have the same subjective states of mind is difficult."). That is, given our conclusion in this interlocutory appeal that the class must plead reliance, this case may never progress into a viable class action, even if class-wide reliance is pleaded.

The second reason is prudential: Given the multitude of ways this case might progress in the trial court, we may never have to address the three remaining questions

in connection with this litigation. For example, if plaintiffs do not attempt to plead class-wide reliance and the case goes forward with just the named plaintiffs, other possible outcomes—such as settlement—might obviate our need to address the remaining three questions that have been certified for interlocutory appeal.[9]

Consequently, mindful that under ORS 19.225 the review of certified questions on interlocutory appeal of a class action is within the discretion of this court, we decline to address the remaining three questions certified for interlocutory appeal in this putative class action, and we decline to address the assignments of error of plaintiffs and Tillamook that correspond with those three questions.

## II. ANALYSIS

Before turning to the particular arguments the parties make on appeal about the need to plead reliance, we provide a brief overview of the UTPA, and two cases, *Pearson II*, and *Scharfstein v. BP West Coast Products, LLC*, 292 Or App 69, 423 P3d 757, *rev den*, 363 Or 815 (2018), *cert dismissed*, 140 S Ct 16 (2019), which help to frame our analysis.

### A. *The UTPA*

"Oregon's UTPA, like those of many other jurisdictions, was enacted as a comprehensive statute for the protection of consumers from unlawful trade practices." *Pearson II*, 358 Or at 115; *see also State ex rel Rosenblum v. Living Essentials, LLC*, 313 Or App 176, 194, 497 P3d 730, *rev allowed*, 368 Or 787 (2021) ("[T]he UTPA is intended to protect consumers in their purchasing decisions."). "The trade practices declared unlawful under the UTPA are extensive, too much so for description." *Pearson II*, 358 Or at 115; *see also* ORS 646.607 (setting forth unlawful trade practices); ORS 646.608 (enumerating approximately 79 additional unlawful trade practices).

---

[9] Additionally, we note that, with regard to the questions on appeal raised by Tillamook, those questions concern only plaintiffs' claims under ORS 646.608 (1)(b). Thus, even if we decided them in Tillamook's favor, the named plaintiffs would still have their claims under ORS 646.608(1)(d) and (e). In other words, resolution of those questions would not resolve this litigation.

Given plaintiffs' complaint, the sections of the UTPA relevant here are ORS 646.608(1)(b), (d) and (e), which provide:

"(1)   A person engages in an unlawful practice if in the course of the person's business, vocation or occupation the person does any of the following:

"* * * * *

"(b)   Causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of real estate, goods or services.

"* * * * *

"(d)   Uses deceptive representations or designations of geographic origin in connection with real estate, goods or services.

"* * * * *

"(e)   Represents that real estate, goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, quantities or qualities that the real estate, goods or services do not have or that a person has a sponsorship, approval, status, qualification, affiliation, or connection that the person does not have."

Pursuant to ORS 646.638, "a person that suffers an ascertainable loss of money or property, real or personal, *as a result of* another person's willful use or employment of a method, act or practice declared unlawful under ORS 646.608, may bring an individual action in an appropriate court to recover actual damages or statutory damages of $200, whichever is greater." (Emphasis added.) The phrase "as a result of" in ORS 646.638 "effectively requires that the unlawful trade practice *cause* the ascertainable loss on which a UTPA plaintiff relies." *Pearson II*, 358 Or at 126 (emphasis in original). Thus, under ORS 646.638, to bring a UTPA claim,

"what a plaintiff must prove is that (1) the defendant committed an unlawful trade practice; (2) plaintiff suffered an ascertainable loss of money or property; and (3) plaintiff's injury (ascertainable loss) was the result of the unlawful trade practice."

*Pearson II*, 358 Or at 127.

Whether, to prove the requisite causation, a plaintiff must show reliance on the alleged unlawful trade practice "depends on the conduct involved and the loss allegedly caused by it." *Id.* The answer as to whether reliance must be shown for a particular claim "requires reasoned analysis of the claim." *Id.*

B.   Pearson II

*Pearson II* involved a putative class action brought on behalf of purchasers of Marlboro Lights cigarettes under ORS 646.608(1)(e), which, as noted, provides that a person engages in an unlawful trade practice if, in the course of that person's business, vocation, or occupation, the person "'represents that goods *** have sponsorship, approval, characteristics, ingredients, uses, benefits, quantities or qualities that they do not have.'" *Id.* at 90, 115 (quoting ORS 646.608(1)(e); brackets omitted). The complaint alleged that the defendant misrepresented that Marlboro Lights would deliver less tar and nicotine than regular Marlboros and that, as a result of that misrepresentation, plaintiffs suffered economic losses. *Id.*

*Pearson II* called upon the court to determine whether plaintiffs were required to prove reliance with respect two different and analytically distinct theories of ascertainable loss on which plaintiffs predicated their class claim. *Id.* at 118. One theory, the "refund of purchase price" theory, was that the plaintiffs and the class members bought Marlboro Lights believing defendant's representation of the "inherent lightness" of such cigarettes, they did not get what they believed they were getting, and they therefore were entitled to a refund of their purchase price. *Id.* at 119. The other theory was the "diminished value" theory. *Id.* With regard to that theory, the plaintiffs' theory was that they and the class members bought a product that was worth less than they paid for it, and their damages were the difference in the value of the product as represented versus the value of the product they actually received. *Id.* at 118-19.

With regard to the "refund of purchase price" theory, "plaintiffs alleged that they suffered ascertainable loss 'as a direct result' of defendant's misrepresentation" regarding light cigarettes, "because they paid for cigarettes that

'they believed were inherently lower in tar and nicotine than defendant's regular cigarettes but received cigarettes that would deliver lowered tar and nicotine only if smoked in particular ways,'" and they sought refund of purchase price as a remedy. *Id.* at 124. The court concluded that reliance was required to establish causation for that theory of loss, explaining:

> "Although reliance is not, in and of itself, an element of a UTPA claim, it is a natural theory to establish the causation of the loss (*i.e.*, the 'injury' in a UTPA claim) for a purchaser seeking a refund based on having purchased a product believing it had a represented characteristic that it did not have. Causation is logically established if a purchaser shows that, without the misrepresentation, the purchaser would not have bought the product and thus should be entitled to a refund. But if the purchaser did not care whether the product had a character or quality as represented (or was not aware of the representation) and bought it for other reasons, then the purchaser's expectations have not been frustrated. In that circumstance, the misrepresentation cannot be said to have 'caused' the purchaser to suffer a loss in the form of the purchase price. As a function of logic, not statutory text, when the claimed loss is the purchase price, and when that loss must be 'as a result' of a misrepresentation, reliance is what 'connects the dots' to provide the key causal link between the misrepresentation and the loss. *See Poulos v. Caesars World, Inc.*, 379 F3d 654, 664-65 (2004) (so observing in civil RICO context, where action requires proof of injury as result of unlawful conduct)."

*Pearson II*, 358 Or at 126.

The court further rejected an argument by the plaintiffs that "the class does not have to establish reliance because theirs was a 'failure to disclose' theory, rather than one predicated only on an affirmative misrepresentation." *Id.* at 126. The plaintiffs argued it was a failure to disclose case because they pleaded that defendant "both affirmatively misrepresented that its 'light' cigarettes would inherently deliver low tar and nicotine and failed to disclose that, in order to receive lower tar and nicotine, the smoker would have to smoke the 'light' cigarettes in a particular way." *Id.* at 126-27. In rejecting that argument, the Supreme

Court "decline[d] *** to reduce the analysis" of whether reliance is required to "an exercise in attaching labels," noting that it was "not the nature of the misrepresentation *** that requires proof of reliance," it was the "misrepresentation coupled with plaintiffs' theory for having suffered a loss in the form of the purchase price because they did not get what they believed they were buying." *Id.* at 127. That is, notwithstanding that the plaintiffs' complaint "described defendant's representation in hybrid terms"— that is, "part affirmative misrepresentation and part failure-to-disclose"—"that description did not change the causative link that their refund theory depended on," and under that theory, "proof of reliance on the alleged misrepresentation was integral to plaintiffs' class claim." *Id.* at 127.

Regarding the "diminished value" theory, "'the heart' of that theory was that the class members suffered an economic loss without having 'to ever open the pack' because the product they bought was not what it was labeled to be." *Id.* at 119. That is, plaintiffs "bought a product that was the equivalent of Marlboro regulars, rather than the Marlboro Lights that the product purported to be." *Id.* The court determined that theory of economic loss not to be viable on the record before it, because Marlboro lights "had always been priced the same as Marlboro regulars," and when "there is no difference in the price between a product with the represented feature and one without, plaintiffs' theory of diminished value provides no logically viable theory on which classwide economic losses can be established." *Id.* at 100, 124. Because the court determined that the plaintiffs' diminished value theory of loss was not viable, the court declined to decide whether plaintiffs' diminished value theory "would or would not require reliance to establish the requisite causal connection for plaintiffs' UTPA claim." *Id.* at 125 n 21.

The court in *Pearson II* also noted, in its discussion of plaintiffs diminished value theory, with regard to a price-inflation type claim, that that theory was not viable on the record before it:

"It may be, as plaintiffs represented to the trial court, that through expert testimony, they had some specialized

economic theory to present to establish on a classwide basis that each of the class members suffered a diminished value loss. In other cases involving light cigarettes and similar allegations of loss, the plaintiffs have attempted to rely on expert testimony to establish that the tobacco industry marketing drove up demand, thus inflating the purchase price of light cigarettes, so that the plaintiffs paid more than they otherwise would have if the truth about light cigarettes had been known. *See, e.g., McLaughlin v. Am. Tobacco Co.,* 522 F3d 215, 226-27 (2d Cir 2008) (rejecting theory of economic loss akin to 'fraud on the market theory'). So far, no court presented with a specialized economic theory of loss has found the theory viable."

*Id.* at 124.

Although the majority in *Pearson II* did not determine whether a "diminished value" claim of the sort brought in *Pearson II* required reliance to establish causation, in a concurrence in *Pearson II*, Justice Walters posited a scenario in which, in her view, a "diminished value" claim could be established under Oregon law without pleading and proving reliance:

"Assume that a seller advertises a tent as having a dozen features, one of which is that the tent is water-proof and another of which is that the tent weighs less than three pounds. Assume that the plaintiff purchases the tent for $100 and that the subjective reason that she does so is that it is represented to be waterproof. The plaintiff plans to go camping that weekend, and rain is forecast. Although the plaintiff reads the description of the tent, including the description of the tent as weighing less than three pounds, weight is not the feature that motivates the plaintiff. She plans to go car camping, not to carry the tent on her back. Assume that, after making her purchase and completing her trip, the plaintiff decides to sell the tent and learns that it weighs six pounds, not the represented three. In addition, the plaintiff learns that, all other features being equal, tents that weigh more than three pounds have a market value of no more than $80.

"In that example, the seller engaged in an unlawful trade practice by representing that the tent had a characteristic that it did not have. ORS 646.608(1)(e). Also in that example, the plaintiff suffered an 'ascertainable loss' as a

'result of' the seller's unlawful trade practice, as required by ORS 646.638(1), because the plaintiff paid the market value of the tent as represented, but the tent was not as represented. The plaintiff's economic loss was the difference between the purchase price of the tent as represented ($100) and the objective market value of the tent that the plaintiff received ($80)—a difference of $20. Because the tent was not as represented, the plaintiff suffered economic loss when she paid more for the tent than it was objectively worth."

*Id.* at 143 (Walters, J., concurring). Thus, in Justice Walters' view, in that hypothetical example, the plaintiff would not need to show "he or she made a subjective choice to purchase the product because of the misrepresented characteristic"—*i.e.*, would not need to show reliance. *Id.* at 143 (Walters, J., concurring).

C.  Scharfstein

*Pearson II* stands in contrast to our decision in *Scharfstein*. In *Scharfstein*, the plaintiff asserted a claim on behalf of himself and a class alleging that BP West Coast Products, LLC (BP), violated the UTPA and the Gasoline Price Advertising Rule, OAR 137-020-0150, by illegally assessing and collecting debit card fees from Oregon consumers. 292 Or App at 71. Specifically, the plaintiff alleged that BP engaged in unfair or deceptive gasoline price advertising when it failed to disclose that it charged a 35-cent fee for the use of a debit card to purchase gasoline at ARCO and *am/pm* service stations, although OAR 137-020-0150 required BP to disclose the 35-cent debit card fee on its street sign before charging the fee. *Id.* at 71, 89-90.

The plaintiff's complaint characterized BP as having engaged in a "prohibited transaction by charging gasoline purchase debit fees without first properly disclosing the fees as required by OAR 137-020-0150." *Id.* at 88. Regarding the ascertainable loss suffered, the plaintiff "claimed that the illegal overcharge of 35-cents is the ascertainable loss." *Id.*

After a jury ruled for the plaintiff and the class, BP appealed, arguing that the plaintiffs were "required to prove that they would have relied on a disclosure that BP

failed to provide, but was legally required to provide before charging the 35-cent debit card fee." *Id.* at 89. BP's argument thus required us to resolve whether the specific UTPA claim at issue *Scharfstein* required proof of reliance to prove causation. *Id.* at 85.

In *Scharfstein*, we conducted a "reasoned analysis" of the plaintiff's claim and concluded that reliance was "not required to prove causation." *Id.* We explained:

"In an illegal charge case such as this one, whether a customer relied on the nondisclosure of a fee does not matter; what matters is whether the fee is disclosed in the particular way that the law requires. The UTPA prohibits businesses from charging customers other types of fees when they are not disclosed in the particular way that the law requires. For example, lessors are required to disclose any late payment, default, pickup and reinstatement fees in the lease-purchase agreement. ORS 646.608 (1)(nn); ORS 646A.124; ORS 646A.126(7). Likewise, late fees assessed by cable service providers are subject to several requirements and limitations (amount, disclosure, and notice provisions). ORS 646.608(1)(rr); ORS 646A.800(2) to (4). Similarly, debt management service providers are allowed to charge certain types of fees only after making required disclosures. ORS 646.608(1)(kkk); ORS 697.692; ORS 697.707. If any of those businesses were to violate any of the terms under which they may assess those fees, the assessment would result in an illegal charge. The customer's actual awareness or knowledge of the illegality would be irrelevant. The particular violation of the UTPA alleged in this case—that BP illegally charged class members an unlawful 35-cent debit card fee because it did not disclose the fee as required by OAR 137-020-0150—does not turn on the customer's knowledge or reliance."

*Id.* at 89.

We further explained causation was satisfied because "BP failed to disclose the legally required information and assessed a debit card fee in violation of the UTPA," and, in doing so, "BP illegally charged its customers 35-cents, thereby causing the ascertainable loss." *Id.* at 90. We contrasted the plaintiff in *Scharfstein* with the plaintiffs in *Pearson II*, noting that the plaintiff in *Scharfstein* "did not allege that BP made misrepresentations or 'half-truths'

about the quality or characteristics of the gasoline in violation of ORS 646.608(1)(e) or seek a refund of the purchase price." *Id.* at 88-89. Thus, unlike in *Pearson II*, where reliance was "integral" to the "refund of purchase price" theory, *Pearson II*, 358 Or at 127, "proof of reliance on BP's nondisclosure was not 'integral' to plaintiffs' claim that BP illegally charged class members an unlawful 35-cent debit card fee," *Scharfstein,* 292 Or App at 89.

D.  *Application*

As noted above, and as the trial court observed, in this case the putative class included individuals who purchased Tillamook products without ever having observed any Tillamook marketing, and the trial court directed that the class be limited to consumers who purchased Tillamook products in reliance on Tillamook's marketing representations as described in plaintiffs' complaint. The trial court further dismissed plaintiffs' claims "based on a price inflation or fraud on the market theory," noting that "no authority presented supports Plaintiffs' price inflation theory as plead[ed] in this complaint." The trial court also dismissed plaintiffs' claims that were based on a "prohibited transaction" theory.

On appeal, plaintiffs contend that the trial court erred, because the "nature of the violations that Plaintiffs allege do not require reliance" and the "nature of the loss that Plaintiffs suffered does not require reliance." Specifically, regarding the nature of the violations, concerning ORS 646.608(1)(b) and (1)(d), plaintiffs argue that they "allege that Tillamook caused a likelihood of consumer confusion and used deceptive representations through the marketing and sale of its dairy products and the impact that its marketing had on the relevant market." Regarding ORS 646.608(1)(e), plaintiffs allege that "Tillamook engaged in prohibited conduct at the time that it represented to consumers in the market that its products had quantities or qualities that they did not have."

Regarding the nature of the loss, plaintiffs assert that they present "a diminished value theory of economic loss"—expressly comparing their theory to the theory at issue

in *Pearson II*—by "alleging that they purchased Tillamook products at an inflated price as a result of Tillamook's material representations and the appreciable consumer confusion that those representations created." Relying on that theory, plaintiffs point to Justice Walter's concurrence in *Pearson II* and assert that they need not show that they "made a subjective choice to purchase the product because of the misrepresented characteristic."

Additionally, relying on *Scharfstein*, plaintiffs contend that their "prohibited transaction" claims—*i.e.*, their claims that the named plaintiffs and the class suffered ascertainable loss by "purchasing misbranded goods sold in violation of 21 U.S.C. § 331, and by purchasing goods disseminated through false advertisements prohibited by ORS 616.215(5)"—do not require any knowledge of the misrepresentations or reliance by plaintiffs or members of the putative class, but that those claims, instead, "turn simply on the illegality of Tillamook's conduct."

Tillamook, for its part, argues that in any UTPA case involving affirmative misrepresentations, "'the causal'/ as a result of element requires proof of reliance-in-fact by the consumer" and that, therefore, "[p]laintiffs must allege ultimate facts demonstrating they purchased [Tillamook's] product(s) in reliance on the alleged misrepresentations." Further, Tillamook asserts that plaintiffs' "fraud on the market" or "price inflation" theory is not cognizable under the UTPA. Finally, Tillamook argues that "the 'prohibited transaction' or 'illegal charge' theory in *Scharfstein* does not apply here and is very narrowly limited to omission cases under which a consumer does not have to prove reliance where a seller fails to disclose information or a fee in violation of a specific statute or regulation requiring that disclosure in the manner specified."

Given the complaint, the briefing before us, and the record, we understand plaintiffs' complaint to assert three distinct theories as to how Tillamook's unlawful trade practices caused their injury: First, a "price-inflation" theory— that is, that "Plaintiffs and Class Members paid more for Tillamook products than they otherwise would have had Tillamook not falsely marketed them," because Tillamook's

misrepresentations increased the market price of Tillamook products; second, an inducement theory—that is, that plaintiffs and members of the putative class "bought Tillamook products when they otherwise would not have (and would have instead purchased other dairy products that do have the benefits that Tillamook claimed its products have)"; and third, what plaintiffs characterize as "prohibited transaction" claims.

We first consider plaintiffs' "price inflation" theory and conclude that the trial court did not err in dismissing plaintiffs' claims to the extent they were based on that theory; as pleaded, that theory is not viable. We then turn to plaintiffs' inducement theory and conclude that that theory requires that plaintiffs allege reliance; thus, the trial court did not err in determining that plaintiffs and the class were required to plead reliance. Finally, we turn to plaintiffs' "prohibited transaction" theory, and conclude that that theory requires reliance in this case, and the trial court did not err by dismissing it.

### 1. *Price Inflation*

As noted, plaintiffs' complaint alleges:

"Plaintiffs and the class purchased goods at an inflated price based upon the represented increased economic market value of those products as a result of Tillamook's successful marketing that created widespread likelihood of confusion or misunderstanding and allowed Tillamook to charge a premium for its dairy products, and as a result plaintiffs and members of the class paid more than they otherwise would have paid for Tillamook dairy products."

In this case, as we understand it, under their price-inflation theory, rather than proving that the misrepresentations in Tillamook's marketing induced each class member to pay more, plaintiffs propose to prove that the misrepresentations empowered Tillamook to charge more across the entire market. As some courts have recognized, the "price-inflation" theory of the sort plaintiffs assert in this case is an extension of the "fraud-on-the-market" theory familiar

from the federal securities fraud context; they both depend on the existence of an "efficient market." *See, e.g.*, *Harnish v. Widener Univ. Sch. of Law*, 833 F3d 298, 312 (3d Cir 2016); *Dzielak v. Whirlpool Corp.*, CV 2:12-89 (KM)(JBC), 2017 WL 6513347, at *8 (DNJ Dec 20, 2017).

In the federal securities fraud context, "courts will often find an efficient market to exist, in which information important to reasonable investors is immediately incorporated into stock prices." *Harnish*, 833 F3d at 310 (internal quotation marks and omission omitted); *see also Kaufman v. i-Stat Corp.*, 165 NJ 94, 113-14, 754 A2d 1188, 1198 (2000) (the "Efficient Capital Markets Hypothesis" "proposes that the price of a stock reflects information known about a corporation whose securities trade publicly" and that under "semi-strong efficiency * * * most information about a company is reflected in its price fairly quickly"). "Once a securities market is found to be efficient, the fraud-on-the-market theory employs the efficient-market finding as the 'intellectual underpinning' for why individualized proof of reliance is not required." *Harnish*, 833 F3d at 310 (internal quotation marks omitted). The fraud-on-the-market theory "is based on the hypothesis that, in an open and developed securities market, misleading statements will defraud purchasers of stock even if the purchasers do not directly rely on the misstatements." *Id.* (internal quotation marks, brackets, and omissions omitted). The fraud-on-the-market theory presumes that purchasers of a stock rely "on the price of the stock as indicative of its value." *Id.* (internal quotation marks omitted). As described by the Supreme Court in *State Treasurer v. Marsh & McLennan Companies, Inc.*, 353 Or 1, 3 n 1, 292 P3d 525 (2012):

"The 'fraud-on-the-market' doctrine refers to a rebuttable presumption establishing the reliance element in securities fraud cases that was addressed and accepted by the United States Supreme Court in *Basic Inc. v. Levinson*, 485 US 224, 247, 108 S Ct 978, 99 L Ed 2d 194 (1988). The doctrine is grounded in the theory that the price of a security traded on the open market is based on publicly available information and that material misrepresentations therefore artificially distort a security's price, thereby establishing indirect or second-order reliance by a purchaser of the

security, even if that purchaser did not rely on the misrepresentations directly."[10]

Although "fraud-on-the-market" and "price inflation" theory are frequently discussed together, there "is a conceptual difference between a 'fraud-on-the-market' theory and a 'price-inflation' theory—the former deems a price to be a representation and presumes that buyers relied on it, whereas the latter sidesteps reliance altogether." *Harnish*, 833 F3d at 312-13. Nevertheless, they both depend on the existence of an efficient market. *Id.* at 312 ("The state courts, like the District Court in this case, have emphasized that recognizing 'price inflation' as a 'cause' of 'ascertainable loss' is essentially the same as extending the fraud-on-the-market presumption to all consumer-fraud cases. The practical effect of both theories is indeed the same, and both depend on the existence of an efficient market."); *Debra F. Fink, D.M.D., MS, PC v. Ricoh Corp.*, 365 NJ Super 520, 553, 839 A2d 942, 964 (Law Div 2003) ("The 'fraud on the market' theory and its counterparts, the 'market inflation' theory and the 'price inflation' theory, appear to be founded upon the same concept that the price of a product or security is directly responsive to false representations and/or factual concealments concerning the characteristics, features or value of a product, service or security."); *see also In re POM Wonderful LLC*, ML 10-02199 DDP RZX, 2014 WL 1225184, at *3 (CD Cal Mar 25, 2014) ("Frauds on the market are only possible in efficient markets, where the price of (in most cases) a stock is determined by openly disseminated information about a business.").

Plaintiffs' price-inflation theory is premised on the idea that the price of Tillamook dairy products responds to publicly available information about Tillamook products, including information published by Tillamook in its marketing materials. If true, Tillamook's misleading marketing claims would, then, have worsened all class members'

---

[10] As described by the Court in *Basic*, 485 US at 247:

"An investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price. Because most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a [federal securities law] Rule 10b-5 action."

positions by causing them to pay more for dairy products than those products are worth. The existence of an efficient market for Tillamook dairy products would permit plaintiffs to prove that all class members' positions were worsened by misleading marketing because Tillamook, as an efficient-market actor responding to available information, charged *everyone* more for its dairy products, regardless of whether Tillamook's marketing impacted each individual class member's decision-making as a consumer or even whether a consumer was aware of Tillamook's misrepresentations. Or, put more simply, rather than proving that the misrepresentations induced each class member to pay more, under plaintiffs' price-inflation theory, they propose to prove that Tillamook's misrepresentations empowered Tillamook to charge more across the entire market.

The Supreme Court has determined that, under Oregon law, "a stock purchaser who purchases stock on an efficient, open market may establish reliance by means of the 'fraud-on-the-market presumption.'" *Marsh & McLennan Companies, Inc.*, 353 Or at 3. But in the context of consumer protection statutes, courts in other jurisdictions have been disinclined to accept the type of price-inflation theory that plaintiffs present in their complaint. *See, e.g., Harnish*, 833 F3d at 312 ("The problem for the plaintiffs is that the state courts have held that the ascertainable-loss and causal-relationship elements of the [New Jersey Consumer Fraud Act] and the [Delaware Consumer Fraud Act] are not met by the kind of price-inflation theory discussed above and advanced by the plaintiffs."); *In re POM Wonderful LLC*, 2014 WL 1225184, at *4 (in considering claim under California's Unfair Competition Law and California's Consumer Legal Remedies Act, noting "[n]or, for that matter, is the court aware of any authority applying a fraud on the market theory to a consumer action.").[11] One reason courts have declined to extend the theory to the market for consumer

---

[11] As one New Jersey court observed in the context of the New Jersey Consumer Fraud Act, accepting the "price inflation" theory of loss would result in "the relationship between the alleged misstatement and the ascertainable loss suffered [to] become so attenuated that it would effectively disappear." *New Jersey Citizen Action v. Schering-Plough Corp.*, 367 NJ Super 8, 16, 842 A2d 174, 178 (App Div 2003).

goods is because that market is not an efficient market.[12] And although the issue has not been squarely addressed by our Supreme Court in the context of the UTPA, as noted above, in *Pearson II*, the court stated that "[s]o far, no court presented with a specialized economic theory of loss has found the theory viable." 358 Or at 124.

Before turning to whether plaintiffs' price-inflation theory is cognizable, we note that it is different from the "diminished value" theory discussed by Justice Walters in her concurrence in *Pearson II*. In Justice Walters' hypothetical—in which she viewed reliance as not being a prerequisite to asserting a "diminished value" claim—the hypothetical consumer read the description of the tent, including that it weighed less than three pounds, but the tent was not as represented; consequently, the consumer lost the "the difference between the purchase price of the tent *as represented* ($100) and the objective market value of the tent that the plaintiff received ($80)." *Pearson II*, 358 Or at 143-44 (Walters, J., concurring) (emphasis added). That theory—which relies on a misrepresentation having reached the plaintiff—is different from plaintiffs' theory that they do not need to allege that any misrepresentation reached any consumer directly to prove that the misrepresentation caused the consumer's loss, because the misrepresentation was reflected in the elevated market price of Tillamook's dairy products.[13]

---

[12] As one treatise observes:

"[T]he overwhelming majority of courts have rejected efforts to export the fraud on the market theory of presumed reliance to common law or statutory fraud cases. In particular, courts have refused to extend the presumption to consumer fraud cases, and have repeatedly recognized that the mere fact that a plaintiff allegedly paid an inflated price for a product is insufficient alone to establish reliance or causation. These decisions are based on the long line of authority that any presumption or inference must be supported by record evidence or at least common sense, as when class members entered into financial transactions that it is reasonably certain were agreed to in reliance on specific financial representations made by defendants. Absent the efficient market underlying the presumption in the securities context, courts will not deny defendants the opportunity to present individual evidence that the alleged fraud did not cause a particular plaintiff's injury."

Joseph M. McLaughlin, 2 *McLaughlin on Class Actions* § 8:11 (18th ed. 2021) (discussing the fraud on the market theory outside of the securities context and citing cases (footnotes omitted).

[13] Courts in other jurisdictions have described Justice Walters' hypothetical as a "benefit-of-the-bargain" claim. *See, e.g.*, *Harnish*, 833 F3d at 309 n 5 ("A

Given the allegations in the complaint and the products at issue, we conclude that plaintiffs' price-inflation theory is untenable. The market for the dairy products at issue in this case, which are consumer goods, is fundamentally different from an open and developed securities market, in the context of which courts have applied the theory of efficient markets. *See McLaughlin v. Am. Tobacco Co.*, 522 F3d 215, 224 (2d Cir 2008), *abrogated on other grounds by Bridge v. Phoenix Bond & Indem. Co.*, 553 US 639, 128 S Ct 2131, 170 L Ed 2d 1012 (2008) ("*Basic* involved an efficient market—the market in securities traded on the New York Stock Exchange—capable of rapidly assimilating public information into stock prices; the market for consumer goods, however, is anything but efficient." (Internal citation omitted.)); *Debra F. Fink, D.M.D., MS, PC*, 365 NJ Super at 554 (noting that "[t]he stock market and the digital camera market are inherently different" and rejecting plaintiffs' "price inflation" theory); *see also Basic*, 485 US at 247 n 29 (describing securities markets as "well-developed, efficient, and information-hungry").

Indeed, when people purchase securities, they generally do so with the same subjective motivation—to make a profit. *See Basic*, 485 US at 246 n 23 ("[T]he incentive for investors to 'pay attention' to issuers' disclosures comes from their motivation to make a profit."). And, if securities markets are efficient—that is, "information important to reasonable investors is immediately incorporated into stock prices," *Harnish*, 833 F3d at 310 (internal quotation marks and omission omitted)—investors can presume that the

benefit-of-the-bargain claim, by contrast, is contract-like. We look to the injuries that resulted from the defendant's having not lived up to the misrepresentation, and the goal is to place the plaintiffs in the position that they would occupy if the misrepresentation were true. *** [A benefit-of-the-bargain claim] entails proving that class members all reasonably expected more from the bargain than what they received."); *Smajlaj v. Campbell Soup Co.*, 782 F Supp 2d 84 (D NJ 2011) ("A plaintiff alleging a benefit-of-the-bargain states a claim if he or she alleges (1) a reasonable belief about the product induced by a misrepresentation; and (2) that the difference in value between the product promised and the one received can be reasonably quantified.").

    In light of plaintiffs' arguments on appeal, the allegations of class causation discussed above, and that the putative class includes individuals who never observed Tillamook's marketing representations, we do not understand plaintiffs to bring a "benefit-of-the-bargain" type claim. We express no opinion on whether reliance would be required under such a theory.

"market price" for a security (absent materially misleading information) reflects, as nearly as possible, the "just price." *See First Interstate Bank v. Dept. of Rev.*, 306 Or 450, 454 n 4, 760 P2d 880 (1988) ("The market price and the market value are different. The market price is the amount actually paid for a property. The market value is the property's value in the open market."); *see also Basic Inc.*, 485 US at 246 ("'The idea of a free and open public market is built upon the theory that competing judgments of buyers and sellers as to the fair price of a security bring about a situation where the market price reflects as nearly as possible a just price.'" (Quoting HR Rep No 1383, 73d Cong, 2d Sess, 11 (1934).)).

Given the allegations in the complaint, in our view, the same cannot be said of the market for Tillamook dairy products. We do not think that it is plausible that a consumer of Tillamook products would rely on the market price of a Tillamook product for the purpose of determining the "just price" or objective market value of that product. That is because, as plaintiffs' complaint highlights, on a given day, the price of a particular Tillamook dairy product can vary substantially depending on the store at which one purchases it. *See In re POM Wonderful LLC*, 2014 WL 1225184, at *4 ("This court is not persuaded, nor do Plaintiffs contend, that the market for Defendant's high-end refrigerated juice products operates efficiently.").

And in contrast to securities—which as noted, people generally purchase to make a profit—people choose different dairy products for myriad reasons: As plaintiffs allege, some people perhaps saw Tillamook's advertisements and purchased Tillamook products because they perceived them to be ecofriendly. Others, however, might have purchased Tillamook products because of the expiration date on the packaging; because of a sense of brand loyalty; because they like the taste of the product; because the product was conveniently located on the endcap of a grocery store isle; or because they wanted to purchase a dairy product made in Oregon. Dairy consumers who purchased Tillamook products for any of those *other* reasons, and who had not seen the misrepresentations alleged in plaintiffs' complaint, were not deceived as to what they were purchasing; they received what they believed they were paying for at the price they

agreed to pay. *Pearson II*, 358 Or at 126 ("But if the purchaser did not care whether the product had a character or quality as represented (or was not aware of the representation) and bought it for other reasons, then the purchaser's expectations have not been frustrated."). As we stated in *Living Essentials*, "[t]here is no need to provide a remedy for misrepresentations that are irrelevant to consumers' purchasing decisions to accomplish the goal of protecting consumers." 313 Or App at 194.

In sum, given the allegations in the complaint and the products at issue, the trial court did not err in concluding that plaintiffs' "price inflation" theory of causation is not a viable theory in this case.

   2.   *Inducement*

As noted above, we also understand plaintiffs' complaint to allege causation of loss through an inducement theory—that is, that "Plaintiffs and the class paid higher prices for Tillamook's dairy products *because of their understanding* that the dairy products all came from the small family farms with increased priority of animal welfare in Tillamook County and the Tillamook County Creamery Association, located in Tillamook' plaintiffs and class members." (Emphasis added.)

Inducement is a reliance-based theory of loss, with reliance being what "connects the dots" to provide "the key causal link between the misrepresentation and the loss." *See Pearson II*, 358 Or at 126; *see also Sanders v. Francis*, 277 Or 593, 598, 561 P2d 1003 (1977) ("In many cases plaintiff's reliance may indeed be a requisite cause of any loss, *i.e.* when plaintiff claims to have acted upon a seller's express representations."); *Harnish*, 833 F3d at 309 n 5 (characterizing "inducement" as a "reliance-based" theory). To the extent plaintiffs assert an inducement-based theory of causation, the trial court did not err in requiring plaintiffs plead that they observed and relied on Tillamook's alleged misrepresentations.[14]

---

[14] We note again that given the controlling questions certified by the trial court, the trial court's determination that plaintiffs did not plead reliance with regard to the putative class is not before us on appeal; rather, the issue before us

### 3.  *"Prohibited Transaction" Claims*

That brings us to plaintiffs' "prohibited-transaction" claims. With regard to those claims, plaintiffs allege that "plaintiffs and members of the class purchased 'misbranded goods' as defined by 21 C.F.R. § 101.18, which is prohibited under 21 U.S.C. § 331," and allege that "Tillamook disseminated false advertisements as defined by ORS 616.265 and ORS 616.270, which is prohibited by ORS 616.215(5)." Relying on *Scharfstein*, plaintiffs argue that they need not plead reliance, because "Tillamook's marketing and advertising, including representations it made regarding the geographic origin of its products and the production and animal welfare practices of its business, were false and misleading and violated state and federal law," and that plaintiffs' "claims based on those illegal representations do not turn on any knowledge or reliance by Plaintiffs or members of the putative class they turn simply on the illegality of Tillamook's conduct." In plaintiffs' complaint, with regard to their "prohibited transaction" claims, the named plaintiffs and the class "seek damages based upon the purchase price for those *** products."

Plaintiffs' reliance on *Scharfstein* is misplaced. As described above, *Scharfstein* was an "illegal charge" case where the unlawful trade practice (charging class members an unlawful 35-cent debit card fee) directly caused the ascertainable loss (the 35-cent overcharge). Consequently, reliance was not required to "connect[] the dots" to provide the causal link between unlawful trade practice and the loss. *Pearson II*, 358 Or at 126. *Scharfstein* stands in contrast to *Pearson II*, where the plaintiffs alleged that they and the class members bought Marlboro Lights believing defendant's representation of the "inherent lightness" of such cigarettes, they did not get what they believed they were getting, and they therefore were entitled to a refund of their purchase price. *Id.* at 119. In *Pearson II*, the plaintiffs who sought a refund of the purchase price were required to plead reliance.

on appeal is whether trial court erred in determining that plaintiffs and the class were required to plead reliance. And, on appeal, plaintiffs do not contend that they pleaded reliance with regard to the class.

The difficulty with plaintiffs' argument in this case regarding reliance in connection with their "prohibited transaction" claims is that although their "prohibited transaction" allegations may allege an unlawful trade practice, those allegations do not independently supply the causation needed to link the unlawful trade practice to the alleged ascertainable loss—*i.e.*, damages based on the purchase price. This is not an "illegal charge" case like *Scharfstein* where there is an obvious causal link between the unlawful trade practice, on the one hand, and the ascertainable loss, on the other.

In this case, as noted above, plaintiffs allege that "Tillamook's marketing and advertising, including representations it made regarding the geographic origin of its products and the production and animal welfare practices of its business, were false and misleading and violated state and federal law." At their core, those are allegations that Tillamook made misrepresentations about its products, even if those misrepresentations could be characterized as "part affirmative misrepresentation and part failure-to-disclose," *Pearson II*, 358 Or at 127, and even if those misrepresentations were unfair trade practices because they violated state and federal law, as plaintiffs allege. And what plaintiffs seek, as we understand it, is a refund of the purchase price.[15] As the court explained in *Pearson II*, as "a function of logic, * * * when the claimed loss is the purchase price, and when that loss must be 'as a result' of a misrepresentation, reliance is what 'connects the dots' to provide the key causal link between the misrepresentation and the loss." 358 Or at 126. That is because "if the purchaser's expectations have not been frustrated" because the purchaser bought the product for reasons other than the misrepresentation, the misrepresentation—whether the misrepresentation is a violation of state and federal law, as alleged in this case, or not—cannot be said to have "'caused' the purchaser to suffer a loss in the form of the purchase price." *Id.*

---

[15] We understand plaintiffs to seek a refund of the purchase price given that, with respect to the "prohibited transaction" claims, plaintiffs' complaint seeks "damages based upon the purchase price." To the extent plaintiffs are instead asserting a "price inflation" theory of loss with respect to their "prohibited transaction" claims, we reject that theory for the reasons discussed above. 321 Or App at 238-45.

In sum, given the nature of the unlawful trade practice at issue—*i.e.*, misrepresentations—and the ascertainable loss asserted with respect to plaintiffs' "prohibited transaction" claims—*i.e.*, the purchase price—linking the alleged misrepresentations to plaintiffs' losses in this case "requires forging a chain of inferences that, viewed together, amount to individualized reliance." *Poulos v. Caesars World, Inc.*, 379 F3d 654, 665 (9th Cir 2004). Consequently, we conclude that the trial court did not err when it concluded that plaintiffs' "prohibited transaction" claims required plaintiffs to plead reliance.[16]

---

[16] We also note that, in support of their argument that their "prohibited transaction" claims did not require them to plead reliance, plaintiffs point to *Tri-West Const. v. Hernandez*, 43 Or App 961, 607 P2d 1375 (1979), for the proposition that "proof that a party justifiably relied on a representation is not necessary when the representation involves a matter about which the party making it is legally required to inform the other." *Id.* at 972. That is true, as far as it goes. But plaintiffs' reliance on *Tri-West Const.* is misplaced because *Tri-West Const.* concerned the need to prove whether reliance was justifiable, not whether reliance was necessary to establish causation on claims such as plaintiffs' "prohibited transaction" claims in this case, in which they seek a refund of the purchase price.

In *Tri-West Const.*, the defendants, homeowners, brought a counterclaim under the UTPA against the plaintiff, a contractor. The defendants and the plaintiff had entered into a written home improvement contract that, as required by state and federal law, included a right to rescind written into the contract. *Id.* at 972. When the defendants informed the plaintiff's agent that they wanted to rescind, however, the plaintiff's agent told the defendants that they had no right to rescind because the materials for the project had already been ordered and were in the course of delivery. *Id.* at 964. Subsequently, the plaintiff's president appeared at the defendants' home, and, following a "heated argument" in which the defendants reiterated that they did not want the plaintiff to carry out the contract, the plaintiff's president stated that the plaintiff was going to perform the work anyway. *Id.* As a result of the oral representation and acts undertaken by the plaintiff, the defendants believed they had "had no right at all to cancel or have the [contracted for] work stopped," and the work was performed by the plaintiff. *Id.*

The trial court ruled for the defendants on their counterclaim, and the plaintiff appealed arguing, among other points, that because the defendants had "actual written notice of their right to rescind [in the home improvement contract], they could not justifiably rely upon any contrary representation made by plaintiff or its agent." *Id.* at 971. We held "proof that a party justifiably relied on a representation is not necessary when the representation involves a matter about which the party making it is legally required to inform the other," and that because there "was evidence that defendants *were required* to make certain out of pocket payments to third parties to protect their property interests *as a result* of their having not been able to prevent plaintiff from proceeding with the work" it was "not error for the trial court to measure their damage by those amounts." *Id.* at 972 (emphasis added).

Just as the defendants in *Tri-West* demonstrated a causal connection between the misrepresentation and the ascertainable loss—*i.e.*, the out-of-pocket payments

## IV.  CONCLUSION

In sum, we conclude that plaintiffs' "price-inflation" theory is not a viable theory in this case. We conclude, further, that plaintiffs' inducement and "prohibited transaction" theories required that plaintiffs plead reliance on Tillamook's alleged misrepresentations.

Thus, we reject plaintiffs' first two assignments of error, answer the four questions that we have undertaken to address on interlocutory appeal "yes," and we therefore affirm the trial court's order as to those limited issues.

Trial court order dismissing claims affirmed; remanded.

---

to third parties *required as a result* of not being able to prevent the plaintiff from proceeding with the work—in this case, plaintiffs must demonstrate a causal connection between the unlawful trade practice (the misrepresentations in violation of state and federal law) and the ascertainable loss (refund of the purchase price). As discussed above, with regard to plaintiffs' "prohibited transaction" claims, that demonstration requires plaintiffs to plead reliance.