No. 10 April 3, 2025 343

IN THE SUPREME COURT OF THE
STATE OF OREGON

Sonja BOHR,
Tamara Barnes, Karen Foglesong,
and Mary Wood, on behalf of themselves
and all others similarly situated,
*Petitioners on Review,*

*v.*

TILLAMOOK COUNTY CREAMERY ASSOCIATION,
an Oregon cooperative corporation,
*Respondent on Review.*

Sonja BOHR,
Tamara Barnes, Karen Foglesong,
and Mary Wood, on behalf of themselves
and all others similarly situated,
*Petitioners on Review,*

*v.*

TILLAMOOK COUNTY CREAMERY ASSOCIATION,
an Oregon cooperative corporation,
*Respondent on Review.*

(CC 19CV36208) (CA A175575) (SC S069773)

On review from the Court of Appeals.*

Argued and submitted March 4, 2024, at Lewis & Clark Law School, Portland, Oregon.

Nadia H. Dahab, Sugerman Dahab, Portland, argued the cause and filed the briefs for petitioners on review. Also on the brief were David F. Sugerman, Sugerman Dahab, Portland; Tim Quenelle, Tim Quenelle PC, Lake Oswego; and Amanda Howell, Animal Legal Defense Fund, Cotati, California.

Michael J. Sandmire, Buchalter Law Firm, Portland, argued the cause and filed the brief for respondent on review. Also on the brief were Alexandra M. Shulman, and Daniel L. Lis.

_____

* Appeal from Multnomah County Circuit Court, Kelly Skye, Judge. 321 Or App 213, 516 P3d 284 (2022).

Carson L. Whitehead, Assistant Attorney General, Salem, filed the brief for *amicus curiae* Oregon Department of Justice. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Kelly D. Jones, Law Office of Kelly D. Jones, Portland; Chris Mertens, Mertens Law, LLC, Portland; and Thomas Bode, Larkins Vacura Kayser, LLP, Portland, filed the brief for *amici curiae* Oregon Consumer Justice and Oregon Trial Lawyers Association.

Elizabeth H. White, K&L Gates, LLP, Harrisburg, Pennsylvania, filed the brief for *amici curiae* The Chamber of Commerce of the United States of America, Consumer Brands Association, Food Northwest, National Federation of Independent Business Small Business Legal Center, Inc., National Retail Federation, Oregon Business & Industry, and Retail Litigation Center, Inc. Also on the brief were David R. Fine, K&L Gates, LLP, Harrisburg, Pennsylvania, and Henry G. Ross, K&L Gates, LLP, Portland.

Before Flynn, Chief Justice, and Duncan, Garrett, DeHoog, James, and Masih, Justices, and Balmer, Senior Judge, Justice pro tempore.**

GARRETT, J.

The decision of the Court of Appeals is reversed, and the case is remanded to the Court of Appeals for further proceedings.

Balmer, S.J., concurred and filed an opinion.

_____

** Bushong, J., did not participate in the consideration or decision of this case.

**GARRETT, J.**

In this putative class action arising under Oregon's Unlawful Trade Practices Act (UTPA), plaintiffs allege that defendant Tillamook County Creamery Association (Tillamook) made false representations regarding the nature and origin of its dairy products sold at retail. Plaintiffs contend that, through its marketing and advertising campaigns, Tillamook caused consumer confusion by representing that its dairy products are sourced from small, family-owned farms in Tillamook County that prioritize animal welfare; in reality, plaintiffs allege, Tillamook sources most of its milk from a large "factory farm" in eastern Oregon. According to plaintiffs, those misrepresentations led consumers to suffer economic harm by purchasing products that they otherwise would not have purchased or by paying artificially inflated "premium" prices—that is, higher prices than Tillamook's products would have been able to command in the market in the absence of the false representations.

The issue before this court is a narrow one: whether plaintiffs' UTPA claim requires them to plead that Tillamook's false representations were "observed and relied upon" by anyone seeking recovery. Concluding that the answer is yes, the trial court granted in part Tillamook's ORCP 21 motion to dismiss. The court reasoned that, although the complaint adequately alleges reliance on the part of the named plaintiffs, it fails to do so for members of the putative class, which includes people who, as the trial court put it, had purchased Tillamook's products "without ever having observed any Tillamook marketing." The Court of Appeals agreed and affirmed the trial court's ruling. We allowed plaintiffs' petition for review and now reverse the decision of the Court of Appeals. As we will explain, plaintiffs have alleged violations of the UTPA on legal theories that, at least as pleaded, do not all logically depend on a showing that individual purchasers observed or relied on Tillamook marketing and advertising. The reasons that the lower courts identified in rejecting certain of those theories may bear on whether a class should be certified and on whether plaintiffs ultimately will be able to prove their claim, but not on whether they have pleaded ultimate facts sufficient to state a claim for purposes of ORCP 21 A.

# I.  BACKGROUND

A.  *Nature of Allegations*

This appeal arises out of the trial court's order granting in part Tillamook's ORCP 21 A motion to dismiss plaintiffs' second amended complaint for failure to state a claim. Accordingly, we recite the facts from plaintiffs' second amended complaint, assuming the truth of those allegations and giving plaintiffs the benefit of all reasonable inferences that may be drawn from them. *See Lowe v. Philip Morris USA, Inc.*, 344 Or 403, 407 n 1, 183 P3d 181 (2008) ("In reviewing a ruling allowing a motion to dismiss for failure to state a claim, an appellate court assumes that all well-pleaded facts are true and gives the party opposing the motion the benefit of all reasonable inferences that may be drawn from those facts.").

Tillamook is an Oregon cooperative corporation that does business in Oregon and across the country. In 2017, Tillamook's revenue attributable to its dairy products was $800 million. The named plaintiffs are four Oregon residents who, in the year preceding the filing of this action, purchased Tillamook's dairy products from one or more retailers. Plaintiffs allege that they regularly seek out, and are willing to pay more for, dairy products that they perceive as "being more humane and coming from small, pasture-based dairies." Plaintiffs believed that Tillamook's products met that description based on the company's marketing representations.

Plaintiffs allege false representations by Tillamook concerning geographic origin; Tillamook's production practices; and animal welfare. Regarding geographic origin, plaintiffs allege that Tillamook represents that its products are made in Tillamook County "from cows raised in the verdant hills and valleys of the Oregon coast." Those claims are false, according to plaintiffs, because "a large majority of the milk that Tillamook uses in its products is actually sourced from its massive factory farms in Boardman," a location in eastern Oregon that is "flat, arid, and often swelteringly hot—nothing like Tillamook County."

Regarding production practices, plaintiffs allege that Tillamook's marketing campaign "uses only imagery from small, idyllic farms in Tillamook County," and "pervasively shows cows in open-air barns or on fresh, green pasture. They are shown being given personalized attention by the owners of these small farms and their families." Through those representations, Tillamook "perpetuates the idea that Tillamook producers are not 'factory farms' where cows are treated like just one of tens of thousands of units to be milked, but rather small-production farms that respect their animals and traditional farming practices." In reality, plaintiffs allege, Tillamook "sources the large majority of the milk for its products from one of the largest and most industrialized dairies in the world: Threemile Canyon Farms' 70,000-cow complex in Boardman," where cows are confined on feedlots with tens of thousands of other animals and are subject to "round-the-clock" milking performed by robotic arms instead of people.

Finally, regarding animal welfare, plaintiffs allege that Tillamook's marketing features cows that are afforded outdoor access, allowed to graze on open, green pastures, and given personalized care and attention. As one example, the marketing campaign states that, "living just yards from the barn, farmers are around 24/7/365 for their cows." That marketing is deceptive, according to plaintiffs, because the cows in Boardman "are housed by the tens of thousands in industrial-type warehouses where they stand on concrete or in their own waste," they are not free to graze outdoors, and it is "extremely unlikely" that the cows receive individualized attention. Plaintiffs further allege that "the majority of Tillamook's cows are suffering from mastitis—a painful disease caused or made worse by teat trauma from milking, and by poor sanitation."

B.  *Procedural History*

The UTPA provides a private right of action for any person who suffers "an ascertainable loss of money * * * as a result of another person's willful use" of any unlawful trade practice enumerated in ORS 646.608. ORS 646.638(1). A plaintiff bringing an action under ORS 646.638 must prove that (1) the defendant committed an unlawful trade practice

enumerated in ORS 646.608; (2) the plaintiff suffered an ascertainable loss of money or property; and (3) the plaintiff's loss was caused by the defendant's unlawful trade practice. *Pearson v. Philip Morris, Inc.*, 358 Or 88, 127, 361 P3d 3 (2015).

Plaintiffs' second amended complaint (the operative pleading on review) alleges a single claim for relief for violation of the UTPA and seeks to represent a class of persons who purchased Tillamook dairy products in Oregon during the class period. Within that claim for relief are two counts. For the first count, alleging a "willful" violation of the UTPA, plaintiffs allege that Tillamook's representations violated three different provisions of the statute: ORS 646.608(1)(b) (causing likelihood of confusion or of misunderstanding as to the source of goods); ORS 646.608(1)(d) (using deceptive representations or designations of geographic origin in connection with goods); and ORS 646.608(1)(e) (representing that goods have qualities or characteristics that they do not have).[1]

Next, plaintiffs allege that, as a result of those violations, plaintiffs and the class members suffered "ascertainable losses" in several ways. As pertinent to the issues before us on review, those include the following. First, plaintiffs purchased Tillamook goods "at an inflated price based upon the represented increased economic market value of those products" because Tillamook's false portrayals "allowed Tillamook to charge a premium for its dairy products, and as a result plaintiffs and members of the class paid

---

[1] ORS 646.608 provides, in part:

"(1) A person engages in an unlawful practice if in the course of the person's business, vocation or occupation the person does any of the following:

"* * * * *

"(b) Causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of real estate, goods or services.

"* * * * *

"(d) Uses deceptive representations or designations of geographic origin in connection with real estate, goods or services.

"(e) Represents that real estate, goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, quantities or qualities that the real estate, goods or services do not have or that a person has a sponsorship, approval, status, qualification, affiliation, or connection that the person does not have."

more than they otherwise would have paid for Tillamook dairy products." Second, plaintiffs "paid higher prices for Tillamook's dairy products because of their understanding that the dairy products" were sourced as Tillamook represented them to be. Third, the Tillamook products that plaintiffs bought had been "misbranded" in violation of federal law, 21 CFR §101.18 and 21 USC § 331, and had been falsely advertised in violation of ORS 616.215(5), 616.265, and 616.270; further, because Tillamook was "prohibited" from engaging in such conduct, plaintiffs were damaged in the amount of their "purchase price."

Thus, within a single claim for relief, in addition to multiple allegations of unlawful conduct, plaintiffs allege multiple theories of ascertainable loss. One theory is that plaintiffs overpaid because Tillamook's marketing allowed the company to charge a "premium" for its products across the market, and plaintiffs therefore paid "inflated" prices. Throughout this litigation, that has been described as plaintiffs' "price-inflation" or "premium-price" theory. A second theory is that plaintiffs overpaid because they were willing to pay more for Tillamook's products based on their "understanding" (formed by Tillamook's marketing) that those products had certain characteristics. Throughout this litigation, that has been described as plaintiffs' "inducement" theory. A third theory is that plaintiffs were damaged in the amount of the entire purchase price because they purchased "illegal products"—those that had been misbranded or falsely advertised and that Tillamook, therefore, was prohibited from selling. We refer to that, as have the parties and the lower courts, as plaintiffs' "prohibited-transaction" theory.

The complaint alleges a second count for Tillamook's "reckless or knowing" violation of the UTPA, based on the same allegations underlying the first count. For the first count, plaintiffs' prayer seeks "class damages in an amount to be proved at trial"; for the second count, the prayer seeks "statutory damages of $200 per class member."

Tillamook filed several alternative ORCP 21 motions in the trial court, including a motion to dismiss for failure to state ultimate facts sufficient to constitute a claim for relief

under ORCP 21 A; a motion to make plaintiffs' allegations more definite and certain under ORCP 21 D; and a motion to strike several allegations under ORCP 21 E. Under ORCP 21 A, Tillamook moved to dismiss on multiple grounds, including that plaintiffs had failed to sufficiently plead ascertainable loss, causation, and reliance. Tillamook's primary argument was that, to show that plaintiffs suffered an ascertainable loss "as a result of" the alleged UTPA violations, plaintiffs must allege that they relied upon Tillamook's alleged misrepresentations. In support of that contention, Tillamook cited a Court of Appeals case holding that, where the alleged UTPA violations are "affirmative misrepresentations," "the causal/'as a result of' element requires proof of reliance-in-fact by the consumer." *Feitler v. The Animation Celection, Inc.*, 170 Or App 702, 708, 13 P3d 1044 (2000) (citing *Sanders v. Francis*, 277 Or 593, 598, 561 P2d 1003 (1977)).[2]

As to plaintiffs' allegation that Tillamook's marketing allowed it to charge a "premium" for its products throughout the market, Tillamook characterized that as an attempt to sidestep the required showing of individual reliance by invoking a "fraud-on-the-market" theory that is inapplicable outside the context of securities fraud. Tillamook asserted that this court in *Pearson* as well as courts in other jurisdictions have rejected that theory as a means for establishing ascertainable loss and causation in consumer protection cases.

The trial court granted Tillamook's motion to dismiss in part and denied it in part. As to the individual plaintiffs, the court determined that they had sufficiently pleaded reliance and ascertainable loss by alleging that they either would not have purchased Tillamook products or would not have paid as much for them but for Tillamook's misrepresentations (along with supporting allegations that compared the prices of Tillamook's products and other similar products). As for the class allegations, however, the trial court determined that the pleading was defective because

---

[2] As explained in our discussion below, the Court of Appeals' statement in *Feitler* is based on a misunderstanding of our decision in *Sanders* and is contrary to our later decision in *Pearson*. This court did not hold in either of those cases that proof of reliance is always required in any UTPA claim involving "affirmative misrepresentations."

the class as alleged "include[d] consumers who purchased Tillamook products without ever having observed any Tillamook marketing." According to the trial court, the class "must be limited to consumers who purchased Tillamook products in reliance on the Tillamook marketing representations that are the subject of the complaint."

The trial court ruled that "[p]laintiffs' claims that are based on a price inflation or fraud on the market theory in paragraph 76 are dismissed." Although the court agreed with plaintiffs that "whether reliance is required depends upon the nature of the violation and damage alleged," the court determined that "no authority presented supports [p]laintiffs' price inflation theory as plead[ed] in this complaint," and cited our decision in *Pearson* as an indication that this court appears to have rejected that theory.

Finally, the court ruled that "[p]laintiffs' claims that are based on a prohibited transaction theory in reliance on 21 [CFR §] 101.18 and ORS 616.265 and 616.270 are dismissed with prejudice." The trial court's written ruling does not explain the reasoning for that dismissal.

Following the trial court's decision, plaintiffs requested that the trial court certify several controlling questions of law for interlocutory appeal pursuant to ORS 19.225. That statute gives the Court of Appeals discretion to permit an interlocutory appeal of certain orders in a class action, including orders that the trial court has designated as involving "a controlling question of law as to which there is substantial ground for difference of opinion." *See* ORS 19.225; *Joarnt v. Autozone, Inc.*, 343 Or 187, 190, 166 P3d 525 (2007). In their motion, plaintiffs argued that the trial court's order on Tillamook's motion to dismiss had resolved several controlling questions of law that limited the claims of the named plaintiffs and functionally resolved the case against the class members. Plaintiffs highlighted three aspects of the trial court's order that resolved controlling questions of law: (1) the conclusion that plaintiffs and the class members must plead reliance; (2) the conclusion that plaintiffs' claims based on a price-inflation theory are not cognizable; and (3) the dismissal of plaintiffs' claims based on a prohibited-transaction theory.

Tillamook did not oppose plaintiffs' request for interlocutory appeal and proposed additional questions for certification to the Court of Appeals. The trial court agreed with the request and, based on the parties' submissions, certified seven questions for interlocutory appeal. Only questions 1, 2, 3, and 5 are relevant to the issues before us on review, but, for the sake of completeness, we set out all the certified questions below:

1.   "For their claims alleging a violation of the Unlawful Trade Practices Act, ORS 646.608(1)(b), are Plaintiffs and the members of the putative class required to plead and prove that they observed and relied upon Defendant's representations?"

2.   "For their claims alleging a violation of the Unlawful Trade Practices Act, ORS 646.608(1)(d), are Plaintiffs and the members of the putative class required to plead and prove that they observed and relied upon Defendant's representations?"

3.   "For their claims alleging a violation of the Unlawful Trade Practices Act, ORS 646.608(1)(e), are Plaintiffs and the members of the putative class required to plead and prove that they observed and relied upon Defendant's representations?"

4a.   "To establish ascertainable loss under ORS 646.638(1) based upon their theory that Plaintiffs and the members of the putative class overpaid for the Tillamook products compared to competing brands, must Plaintiffs and the members of the putative class plead and prove which Tillamook product(s) Plaintiffs and the members of the putative class purchased and at what cost, as well as the cost of the proper comparator product(s) available at the time of their respective purchases?"

4b.   "If the answer to the foregoing question is 'no,' must Plaintiffs and the members of the putative class nonetheless plead and prove which Tillamook product(s) Plaintiffs and the members of the putative class purchased and at what cost in order to provide the basis for any 'inference' of ascertainable loss?"

5.   "If Plaintiffs plead and prove that Defendant violated 21 USC [§] 331 by selling 'misbranded goods' as defined in 21 CFR [§] 101.18(c), or that Defendant disseminated a

'false advertisement' as prohibited by ORS 616.215(5) and as defined in ORS 616.265 or ORS 616.270, are Plaintiffs and the members of the putative class required to plead and prove reliance upon Defendant's representations for their claims that Defendant violated the Unlawful Trade Practices Act, ORS 646.608(1)(b), (1)(d), and (1)(e)?"

6.  "Whether Plaintiffs' claim under ORS 646.608(1)(b) fails on the basis that the term 'source' in that subsection refers to the company that sells the goods at issue, not the geographic origin of an ingredient used to make the goods, and not the supplier of an ingredient used to make the goods."

7.  "Whether Plaintiffs' claim under ORS 646.608(1)(b) fails on the basis that the meaning of 'goods' in that subsection does not include an ingredient used to make the goods, in this case, milk."

Pursuant to ORS 19.225, plaintiffs and Tillamook both filed applications for interlocutory appeal of the trial court's order certifying controlling questions of law. The Court of Appeals granted both applications for interlocutory appeal, and the parties proceeded to brief their appeals in accordance with the rules governing civil appeals. *See* ORAP 10.05(8) (providing that, if the Court of Appeals allows an application for interlocutory appeal under ORS 19.225, "[t]he appeal shall then proceed in accordance with the statutes and rules governing civil appeals").

## C.  *The Court of Appeals' Decision*

The Court of Appeals ultimately addressed only questions 1, 2, 3, and 5, which concern the issue of reliance. The court answered "yes" to each of those questions and, accordingly, affirmed the trial court's ruling dismissing the claims of the putative class.

The court began by noting that the phrase "as a result of" in ORS 646.638(1) "'effectively requires that the unlawful trade practice *cause* the ascertainable loss on which a UTPA plaintiff relies.'" *Bohr v. Tillamook County Creamery Assn.*, 321 Or App 213, 229, 516 P3d 284 (2022) (quoting *Pearson*, 358 Or at 126 (emphasis in *Pearson*)). The court explained that whether a plaintiff must show reliance on the unlawful trade practice to demonstrate the requisite causation "'requires reasoned analysis of the claim,'" and

ultimately "'depends on the conduct involved and the loss allegedly caused by it.'" *Id.* at 230 (quoting *Pearson*, 358 Or at 127).

Turning to plaintiffs' allegations in this case, the court understood plaintiffs' complaint "to assert three distinct theories as to how Tillamook's unlawful trade practices caused their injury": (1) a "price-inflation" theory; (2) an "inducement" theory; and (3) a "prohibited-transaction" theory. *Id.* at 237-38. The court considered each theory in turn.

Beginning with the "price-inflation" theory, the court described it as a contention that Tillamook's marketing misrepresentations empowered Tillamook to charge more for its products across the entire market, not that the representations induced any individual purchase. *Id.* at 238. Relying on federal case law, the court compared plaintiffs' theory to the "fraud-on-the-market" theory that "refers to a rebuttable presumption establishing the reliance element in securities fraud cases." *Id.* at 238-39 (internal quotation marks omitted). It is based on the idea that, "in an open and developed securities market, misleading statements will defraud purchasers of stock even if the purchasers do not directly rely on the misstatements." *Id.* at 239 (internal quotation marks omitted).

The Court of Appeals concluded that, despite some conceptual differences between the fraud-on-the-market theory and plaintiffs' price-inflation theory, both depend on the existence of an efficient market, meaning a market in which price responds to publicly available information about the value of the product. *Id.* at 240. However, courts in other jurisdictions have been disinclined to accept such a theory in consumer-protection cases, often due to the lack of an efficient market for the product at issue. *Id.* at 241-42. The Court of Appeals noted that, although the issue has not been squarely addressed by this court, in *Pearson*, we stated that "[s]o far, no court presented with a specialized economic theory of loss has found the theory viable" outside the context of securities fraud. *Id.* at 242 (internal quotation marks omitted).

Returning to this case, the Court of Appeals concluded:

"Given the allegations in the complaint and the products at issue, we conclude that plaintiffs' price-inflation theory is untenable. The market for the dairy products at issue in this case, which are consumer goods, is fundamentally different from an open and developed securities market, in the context of which courts have applied the theory of efficient markets.

"* * * * *

"* * * We do not think that it is plausible that a consumer of Tillamook products would rely on the market price of a Tillamook product for the purpose of determining the 'just price' or objective market value of that product. That is because, as plaintiffs' complaint highlights, on a given day, the price of a particular Tillamook dairy product can vary substantially depending on the store at which one purchases it.

"And in contrast to securities—which as noted, people generally purchase to make a profit—people choose different dairy products for myriad reasons: As plaintiffs allege, some people perhaps saw Tillamook's advertisements and purchased Tillamook products because they perceived them to be ecofriendly. Others, however, might have purchased Tillamook products because of the expiration date on the packaging; because of a sense of brand loyalty; because they like the taste of the product; because the product was conveniently located on the endcap of a grocery store aisle; or because they wanted to purchase a dairy product made in Oregon. Dairy consumers who purchased Tillamook products for any of those *other* reasons, and who had not seen the misrepresentations alleged in plaintiffs' complaint, were not deceived as to what they were purchasing; they received what they believed they were paying for at the price they agreed to pay."

*Id.* at 243-45 (internal citations omitted; emphasis in original). Thus, the Court of Appeals held that the trial court had correctly ruled that plaintiffs' "'price-inflation theory of causation' is not a viable theory in this case." *Id.* at 245.

The court next addressed plaintiffs' "inducement" theory, which is based on plaintiffs' allegation that they

and the class members "paid higher prices for Tillamook's dairy products *because of their understanding* that the dairy products all came from the small family farms with increased priority of animal welfare in Tillamook County and the Tillamook County Creamery Association, located in Tillamook[.]" *Id.* (emphasis in original). The court determined that "[i]nducement is a reliance-based theory of loss," and therefore concluded that, "[t]o the extent plaintiffs assert an inducement-based theory of causation, the trial court did not err in requiring plaintiffs [to] plead that they observed and relied on Tillamook's alleged misrepresentations." *Id.*

Finally, the court addressed plaintiffs' "'prohibited-transaction' claims." *Id.* at 246. The court rejected plaintiffs' reliance on *Scharfstein v. BP West Coast Products, LLC*, 292 Or App 69, 423 P3d 757, *rev den*, 363 Or 815 (2018), *cert dismissed*, ___ US ___, 140 S Ct 16 (2019)—a case in which the court held that reliance was not required for the plaintiffs' UTPA claim. The court distinguished *Scharfstein* as an "illegal charge" case, "where the unlawful trade practice (charging class members an unlawful 35-cent debit card fee) directly caused the ascertainable loss (the 35-cent overcharge)" without the need to show reliance by the purchaser. *Bohr*, 321 Or App at 246. In contrast, here, the court understood plaintiffs' prohibited-transaction claims as alleging that Tillamook's misrepresentation of its products through false and misleading advertising violated federal and state law, and they sought damages based on the purchase price of the products for those violations. *Id.* at 247. The court explained that, "'when the claimed loss is the purchase price, and when that loss must be "as a result" of a misrepresentation, reliance is what "connects the dots" to provide the key causal link between the misrepresentation and the loss.'" *Id.* (quoting *Pearson*, 358 Or at 126). Thus, plaintiffs' "prohibited-transaction" claims required plaintiffs to plead reliance, the court concluded. *Id.* at 248.

Having concluded that plaintiffs' price-inflation theory is not viable as a matter of law and that plaintiffs' inducement and prohibited-transaction theories required that plaintiffs and the class members plead reliance on Tillamook's alleged misrepresentations, the court answered

"yes" to the four certified questions asking whether plaintiffs and the class members were required to plead reliance for their various UTPA claims and affirmed the trial court on those rulings. *Id.* at 249.[3]

Plaintiffs petitioned this court for review, which we allowed.

## II.   ANALYSIS

As explained above, to succeed with their UTPA action under ORS 646.638, plaintiffs must ultimately prove: (1) that Tillamook committed an unlawful trade practice under ORS 646.608; (2) that plaintiffs and the class members suffered an ascertainable loss of money or property; and (3) that the loss was caused by the unlawful trade practice. *Pearson*, 358 Or at 127.

In the trial court, Tillamook moved to dismiss plaintiffs' complaint on several grounds. The trial court granted that motion in part, and then certified seven controlling questions of law, on multiple issues, to the Court of Appeals. The Court of Appeals resolved four of those questions, all concerning causation and reliance, and determined that its resolution of those questions made it unnecessary to address the other issues. Because we conclude that the Court of Appeals erred, we reverse and remand to that court for further proceedings, including to consider in the first instance whether it should address one or more of the other controlling questions of law that it accepted but did not resolve.

## A.   *Whether Plaintiffs' Claim Requires Pleading "Reliance"*

The trial court and the Court of Appeals concluded that plaintiffs' legal theories, as alleged, require them to

---

[3] With respect to the remaining certified questions, the court explained that, because the class members had failed to plead reliance as required, the court had functionally resolved the claims of the putative class. *Id.* at 225-26. Having done so, the court determined that resolution of the remaining certified questions would apply only to the named plaintiffs, rendering those remaining questions no longer controlling questions in a class action. *Id.* at 226-27. Mindful that interlocutory appeals in class actions under ORS 19.225 should be reserved for "exceptional cases," and that the court's review under ORS 19.225 is discretionary, the court declined to address the remaining questions certified for interlocutory appeal. *Id.* at 227-28.

plead that they relied upon Tillamook's representations.[4] Whether the causation element of a UTPA claim requires a showing of "reliance" is a question that this court has considered before. *See Sanders*, 277 Or at 598; *Pearson*, 358 Or at 125-26; *see also State ex rel Redden v. Discount Fabrics*, 289 Or 375, 384, 615 P2d 1034 (1980) (describing the issue in *Sanders* as "whether reliance was a necessary element to a private action under ORS 646.638(1) *** because of the requirement that the loss be the 'result of' wilful conduct"). "Our answer has been: 'It depends.'" *Pearson*, 358 Or at 126.

ORS 646.638(1), by its terms, does not require reliance by the consumer. *Id.* at 125. Instead, the statute requires that the plaintiff suffer an ascertainable loss "as a result of" the defendant's unlawful trade practice. ORS 646.638(1). "That phrase effectively requires that the unlawful trade practice *cause* the ascertainable loss." *Pearson*, 358 Or at 125-26 (emphasis in original). Due to the extensive range of prohibited conduct under the UTPA, as well as our broad understanding of what constitutes an "ascertainable loss," *Clark v. Eddie Bauer LLC*, 371 Or 177, 184-86, 532 P3d 880 (2023), a specific showing of reliance by the consumer is not always required. For example, we have explained that, in cases where "the representation takes the form of a 'failure to disclose' ***, it would be artificial to require a pleading that [the] plaintiff had 'relied' on that non-disclosure." *Sanders*, 277 Or at 598. Conversely, in a case where the "plaintiff claims to have acted upon a seller's express representations," the "plaintiff's reliance may indeed be a requisite cause of any loss." *Id.*

Because a UTPA violation can take many forms and result in different kinds of ascertainable loss, "[w]hether reliance is required to establish causation turns on the nature of the unlawful trade practice and the ascertainable loss alleged." *Pearson*, 358 Or at 126 (citing *Discount*

---

[4] The trial court, the Court of Appeals, and even the parties at times have described plaintiffs' various theories as alleging distinct "claims." For example, the controlling questions of law certified to the Court of Appeals refer to plaintiffs' different "claims" under three distinct provisions of the UTPA. As we understand the second amended complaint, however, plaintiffs have alleged a single claim, within which they have alleged multiple theories that could support relief. For that reason, we find it more precise to address whether each of those *theories* logically requires pleading reliance.

*Fabrics*, 289 Or at 384; *Sanders*, 277 Or at 598-99); *see also Clark*, 371 Or at 189 (recognizing that "the UTPA defines a host of unlawful trade practices, which may cause ascertainable losses in myriad ways"). That determination requires a "reasoned analysis" of the claim. *Pearson*, 358 Or at 127.

The Court of Appeals' analysis, and Tillamook's arguments on review, rely heavily on this court's decision in *Pearson* for the proposition that plaintiffs in this case were required to plead reliance. Because *Pearson* is central to the arguments on review, we discuss that case in detail.

The plaintiffs in *Pearson*, two individuals who had purchased Marlboro Light cigarettes, brought a class action against the defendant, the manufacturer and seller of the product, for violations of the UTPA. 358 Or at 90. For their class claim, the plaintiffs alleged that the defendant had violated ORS 646.608(1)(e) by representing that Marlboro Lights were "inherently" lower in tar and nicotine, when in fact the amount of tar and nicotine varied based on smoker behavior. *Id.* at 117. The plaintiffs asserted that they and the class members suffered ascertainable losses "as a direct result" of the defendant's misrepresentation "because they paid for cigarettes they believed were inherently lower in tar and nicotine than [the] defendants' regular cigarettes but received cigarettes that would deliver lowered tar and nicotine only if smoked in particular ways." *Id.* at 118. By way of relief, the plaintiffs asked for "[e]conomic damages for purchase price refund or diminished value, in an amount to be proved at trial." *Id.* (brackets in original).

Shortly after the defendant filed its answer, the plaintiffs moved for class certification under ORCP 32 C(1). *Id.* at 96. The trial court denied the plaintiffs' motion, ruling that individual issues predominated over the common issues of law and fact, and, for that reason, a class action was not a superior means for resolving the putative class members' individual claims. *Id.* at 99. The Court of Appeals disagreed, concluding that the essential elements of the UTPA claim could be proved through evidence common to the class. *Id.* at 90. On review, this court held that the Court of Appeals had erred. *Id.* at 90-91.

The ultimate issue before this court was whether the plaintiffs had "carried their burden to show that \*\*\* evidence common to the class will generate common answers for the individual members." *Id.* at 115. On that point, the court noted that the dispute in the lower courts centered on the elements of ascertainable loss and causation. *Id.* at 118. Regarding the former, the Court of Appeals had concluded, contrary to the trial court's conclusion, that ascertainable loss could be resolved based on evidence common to the class. *Id.* Regarding the latter, both lower courts had agreed that proof of causation would require proof of reliance, but the Court of Appeals had concluded, contrary to the trial court, that causation and reliance could be proved by proof common to the class. *Id.*

To address those issues on review, this court distinguished the theories of ascertainable loss on which the plaintiffs predicated their class claim. *Id.* For their first theory of loss, referred to as a "diminished value" theory, the plaintiffs alleged that they had purchased a product that was worth less than what they paid for it, and that their damages were the difference between the value of the product as represented and the lesser value of the product that they received. *Id.* at 118-19. That theory was premised on the notion that the characteristic of "inherent lightness" had economic value, so that when the class members purchased Marlboro Lights, which lacked the "inherent lightness" characteristic, they suffered an out-of-pocket economic loss. *Id.* at 119. For their second theory of loss, referred to as a "refund of purchase price" theory, plaintiffs alleged that they "bought Marlboro Lights believing [the] defendant's representation of inherent lightness, they did not get what they believed they were getting, and they therefore were entitled to a refund of their purchase price." *Id.*

Beginning with the diminished value theory, the defendant had produced evidence that Marlboro Lights had always been priced the same as its regular cigarettes and argued that that evidence defeated the plaintiffs' theory that class members suffered out-of-pocket losses as measured by the difference in value between Marlboro Lights and Marlboro regulars. *Id.* at 119-20. This court agreed. We

explained that, "[w]hen the price of goods is not different based on some represented quality (say, for example, color or flavor), it simply does not logically follow that the quality has greater *economic* worth." *Id.* at 122 (emphasis in original). Further, the fact that Marlboro Lights and regulars cost the same also defeated "a reasonable inference that [the] plaintiffs and the class members paid too much (which a diminished value theory requires)." *Id.* at 122-23. We recognized that,

> "[i]n other cases involving light cigarettes and similar allegations of loss, the plaintiffs have attempted to rely on expert testimony to establish that the tobacco industry marketing drove up demand, thus inflating the purchase price of light cigarettes, so that the plaintiffs paid more than they otherwise would have if the truth about light cigarettes had been known. *See, e.g.*, *McLaughlin v. Am. Tobacco Co.*, 522 F3d 215, 226-27 (2d Cir 2008) (rejecting theory of economic loss akin to 'fraud on the market theory'). So far, no court presented with a specialized economic theory of loss has found the theory viable."

*Id.* at 124. But regardless, the plaintiffs in *Pearson* had failed to come forward with evidence supporting such a theory. *Id.* This court therefore concluded that the "plaintiffs' theory of diminished value provide[d] no logically viable theory on which classwide economic losses can be established." *Id.*

Turning then to the plaintiffs' "refund of purchase price" theory of loss, this court noted that one of the key legal disagreements was whether the plaintiffs, to prevail on their class claim, would have to prove "reliance"; specifically, "whether [the] plaintiffs' claim required proof that a substantial factor in each class member's decision to purchase Marlboro Lights was the 'lowered tar and nicotine' representation on their packaging." *Id.* at 125. We noted that the text of ORS 646.638(1) does not, by its terms, require reliance, but it does require that the unlawful trade practice cause the ascertainable loss on which a UTPA plaintiff relies. *Id.* at 125-26. Based on previous case law, we explained that whether reliance is required to satisfy the causation element of ORS 646.638(1) "turns on the nature of the unlawful trade practice and the ascertainable loss alleged." *Id.* at

126 (citing *Discount Fabrics*, 289 Or at 384; *Sanders*, 277 Or at 598-99).

In a case where the plaintiff "seek[s] a refund based on having purchased a product believing it had a represented characteristic that it did not have," like the plaintiffs in *Pearson*, we explained that reliance on that misrepresentation, although not a required element of a UTPA claim, is a logical way to establish causation. *Id.* In that instance, if the plaintiff establishes that, absent the misrepresentation, she would not have purchased the product and thus should receive a refund, causation is established. *Id.* But if the plaintiff did not care whether the product had the represented characteristic, or was unaware of the misrepresentation, then the misrepresentation did not cause the plaintiff's loss in the form of the purchase price, because the plaintiff's decision to purchase the product did not depend on the misrepresentation. *Id.* Accordingly, "[a]s a function of logic, not statutory text, when the claimed loss is the purchase price, and when that loss must be 'as a result of' a misrepresentation, reliance is what 'connects the dots' to provide the key causal link between the misrepresentation and the loss." *Id.*

Returning to the plaintiffs' allegations in *Pearson*, we determined that the nature of those allegations relating to the purchase-price theory necessarily required a showing of reliance. *Id.* at 127. Put differently, when the defendant is alleged to have misrepresented a product as having a quality that it does not have, and the plaintiff alleges that she would not have purchased that product but for the defendant's misrepresentation and, thus, that she suffered an ascertainable loss in the form of the purchase price, the plaintiff's reliance on the defendant's misrepresentation is required in order to show that the plaintiff's loss occurred "as a result of" the defendant's unlawful conduct. *See id.*

Throughout the litigation in this case, Tillamook has argued, based on *Pearson*, that any UTPA claim involving "affirmative misrepresentations" requires the plaintiff to plead reliance on the misrepresentation. The Court of Appeals also appears to have drawn that rule from *Pearson*, when it analogized plaintiffs' prohibited-transaction theory to the "refund of purchase price" theory discussed in

*Pearson* and concluded that a showing of reliance is therefore required. *Bohr*, 321 Or App at 247. Our holding in *Pearson*, however, does not stand for the proposition that any UTPA claim involving "affirmative misrepresentations" requires proof of reliance. Nor does it stand for the proposition that an alleged loss measured by the "purchase price" always requires a showing of reliance.

For the plaintiffs' purchase-price claim in *Pearson*, we explained that reliance was "a natural theory to establish the causation of the loss (*i.e.*, the 'injury' in a UTPA claim) for a purchaser seeking a refund *based on having purchased a product believing it had a represented characteristic that it did not have*." 358 Or at 126 (emphasis added). Although we ultimately concluded that, "when the claimed loss is the purchase price, and when that loss must be 'as a result of' a misrepresentation, reliance is what 'connects the dots' to provide the key causal link between the misrepresentation and the loss," we clarified that it was not just the nature of the misrepresentation that required proof of reliance. *Id.* at 126-27. Rather, it was "the misrepresentation coupled with [the] plaintiffs' theory for having suffered a loss in the form of the purchase price *because they did not get what they believed they were buying*." *Id.* at 127 (emphasis added). In that case, "reliance inhere[d] in the combination." *Id.*

The crucial underpinning of our analysis and of the plaintiffs' purchase-price theory of loss was that the plaintiffs had formed a belief about the product's characteristics based on the defendant's representations, they purchased the product with the expectation that it had those represented characteristics, and they suffered a loss when they purchased the product without those characteristics because they did not get what they believed they were buying. In that instance, the consumer's reasons for purchasing the product were determinative of whether the purchase or "loss" was the "result" of the misrepresentation. If the consumer could show that she would not have purchased the product without the misrepresentation, then causation was established. *See id.* at 126. But if the consumer did not care whether the product had the represented characteristic, or was unaware of the representation, then "the misrepresentation cannot

be said to have 'caused' the purchaser to suffer a loss in the form of the purchase price." *Id.* Thus, proof of consumer reliance on the misrepresentation was "integral" to the plaintiffs' class claim in *Pearson*, not merely because of the misrepresentation or because the measure of loss was the purchase price, but because the plaintiffs' theory of recovery depended on them having formed a belief about the product's represented characteristics and, then, not receiving what they believed they were buying. *See id.* at 127.

B.    *Plaintiffs have alleged legal theories that do not logically require a showing of reliance on misrepresentations.*

In this case, plaintiffs allege a theory that resembles the plaintiffs' purchase-price theory in *Pearson*—that, at least as to the named plaintiffs, they purchased Tillamook products because they had formed a belief based on Tillamook's marketing and advertising that the products had certain characteristics that they do not have. But they also allege additional theories that, unlike the purchase-price theory in *Pearson*, are not dependent on purchasers having had any particular understanding about the nature and origins of Tillamook's products. They allege that Tillamook's misrepresentations allowed the company to charge a "premium" for its products, a premium paid by all purchasers. And, for their prohibited-transaction theory, plaintiffs allege that they and the class members suffered ascertainable loss as a result of Tillamook's unlawful conduct because they purchased "misbranded goods" as defined by 21 CFR § 101.18(c) and "illegally advertised products" under ORS 616.265 and ORS 616.270. With respect to that theory, they allege that, because Tillamook was prohibited from selling misbranded goods by federal law, 21 USC § 331, and prohibited from falsely advertising its products by state law, ORS 616.215(5), plaintiffs and the class are entitled to damages based on the purchase price of those "illegal products."

The Court of Appeals broadly understood plaintiffs' prohibited-transaction theory as alleging that Tillamook had made misrepresentations about its products and seeking a refund of the purchase price. *Bohr*, 321 Or App at 247. The court thus invoked *Pearson* to conclude that, "when the

claimed loss is the purchase price, and when that loss must be as a result of a misrepresentation, reliance is what connects the dots to provide the key causal link between the misrepresentation and the loss." *Id.* (internal quotation marks omitted). The key difference between the plaintiffs' theory of recovery in *Pearson* and plaintiffs' prohibited-transaction theory here, however, is that plaintiffs' prohibited-transaction theory, as stated in the complaint, does not depend on plaintiffs having formed any belief about Tillamook's products. Rather, as we understand plaintiffs' allegations, the ascertainable loss is the purchase of an "illegal product" itself, meaning that every person who purchased a Tillamook product suffered that loss because of Tillamook's sale of those illegal products. Plaintiffs seek damages in the amount of the purchase price for those illegal products, not because they did not get what they believed they were buying, but because, they allege, the products never should have been sold in the first place.

Assuming that the foregoing is a viable theory of "ascertainable loss," then we are not persuaded—for purposes of evaluating the sufficiency of plaintiffs' *pleading*—that the loss logically depends on a class member's having known that the products were "misbranded" or falsely advertised. Plaintiffs have pleaded a theory according to which the alleged loss inheres in having paid for an "illegal product." We express no view as to whether that is, in fact, a viable theory of ascertainable loss under the UTPA. That question has not been briefed and is not before us. The trial court dismissed plaintiffs' "claims that are based on a prohibited transaction theory" without explanation, and the Court of Appeals affirmed that ruling after concluding that plaintiffs' prohibited-transaction theory required plaintiffs to plead reliance. That conclusion was based on the court's premise that any claim predicated on an affirmative misrepresentation and seeking a refund of the purchase price *necessarily* requires a showing of reliance—a premise that, as we have explained, takes an overly broad view of *Pearson*.[5]

---

[5] Because *Pearson* was decided at the class-certification stage rather than on an ORCP 21 motion, it does not expressly speak to when, if ever, reliance must be pleaded to state a claim under the UTPA. Of course, our conclusion in *Pearson* that the plaintiffs' purchase-price theory inherently required a showing of reliance is consistent with the view that pleading reliance may be essential

We turn, next, to plaintiffs' premium-price theory, which asserts that Tillamook's deceptive marketing inflated the market value of those products and allowed Tillamook to charge a higher or "premium" price for its products, causing plaintiffs and the class members to pay a higher price than Tillamook otherwise would have been able to demand. Specifically, the complaint alleges that

> "[p]laintiffs and the class purchased goods at an inflated price based upon the represented increased economic market value of those products as a result of Tillamook's successful marketing that created widespread likelihood of confusion or misunderstanding and allowed Tillamook to charge a premium for its dairy products, and as a result plaintiffs and members of the class paid more than they otherwise would have paid for Tillamook dairy products."

That allegation is not altogether clear, but, reading the complaint as a whole in the light most favorable to plaintiffs and giving them the benefit of all reasonable inferences, we understand it to allege that (1) a sufficient number of consumers are willing to pay more for dairy products with certain represented characteristics, so that (2) as a result, the market prices for Tillamook's products, which were falsely represented to have those characteristics, were driven upward. Those "premium" prices were then paid by all purchasers— those who had observed and relied upon Tillamook's misrepresentations and those who had not. The Court of Appeals concluded that, for consumers in the latter category, the complaint failed to state a claim because those consumers had not been deceived. We disagree with that reasoning.

The Court of Appeals noted that consumers choose dairy products for "myriad reasons," and that consumers who purchased Tillamook products "for any of those *other* reasons, and who had not seen the misrepresentations

---

to those types of "inducement-based" theories under the UTPA—*viz.*, where a plaintiff expressly alleges that she was misled by a defendant's misrepresentations into making a purchase that she otherwise would not have made. But that point is little more than tautological: It is difficult to conceive of how a plaintiff would plead such an "inducement-based" theory *without* alleging that she was "induced," *i.e.*, that she relied upon (and purchased the product because of) the misrepresentation that constitutes the alleged unlawful practice. To the extent that the lower courts concluded that an "inducement-based" theory like that discussed in *Pearson* requires a plaintiff to show reliance, we do not understand plaintiffs to take issue with that conclusion.

alleged in plaintiffs' complaint, were not deceived as to what they were purchasing; they received what they believed they were paying for at the price they agreed to pay." *Bohr*, 321 Or App at 244-45 (emphasis in original).

It may be true that consumers who did not rely on Tillamook's alleged misrepresentations were not deceived, but it does not necessarily follow that *none* of them suffered an ascertainable loss—at least, if plaintiffs' premium-price theory can be economically proven. Suppose a hypothetical Oregon consumer purchased Tillamook cheese for four dollars, instead of a competitor's cheese for three dollars, for the sole reason that the consumer prefers to support Oregon businesses, and that she knew nothing about Tillamook's production practices. That buyer received exactly what she was expecting at the price she was willing to pay. But if, as plaintiffs allege, the market price of the Tillamook cheese would have been less than four dollars if not for Tillamook's deceptive marketing, then the consumer still experienced an economic loss. Thus, like the prohibited-transaction theory, the premium-price theory is one that does not, *as pleaded*, appear to necessitate a showing that every buyer relied on Tillamook's representations.

We briefly address the Court of Appeals' other reason for rejecting the premium-price theory as untenable. As explained above, the court analogized plaintiffs' price-inflation or premium-price theory to the "fraud-on-the-market" theory that courts have applied in the federal securities context, and determined that the analogy fails here because, unlike the market for publicly traded securities, the market for Tillamook's goods is not efficient. *Bohr*, 321 Or App at 238-39, 243-45. The court went on to explain:

> "We do not think that it is plausible that a consumer of Tillamook products would rely on the market price of a Tillamook product for the purpose of determining the 'just price' or objective market value of that product. That is because, as plaintiffs' complaint highlights, on a given day, the price of a particular Tillamook dairy product can vary substantially depending on the store at which one purchases it."

*Id.* at 244.

The Court of Appeals' analysis was premature in this procedural posture. Plaintiffs' complaint alleges that (1) Tillamook's misleading marketing violates ORS 646.608; (2) plaintiffs and the class members suffered an ascertainable loss of money by paying inflated or premium prices for Tillamook's products; and (3) Tillamook's unlawful marketing caused plaintiffs and the class members to pay those higher prices. As to causation specifically, plaintiffs allege that Tillamook's misleading marketing concerning the source and qualities of its dairy products inflated the market value of its products and allowed Tillamook to charge a premium price. Plaintiffs reference statistics from several consumer reports in their complaint, alleging that consumers regularly seek out and are willing to pay more for products that are locally produced and made by small-scale farmers. Plaintiffs further allege that Tillamook's misleading marketing and sales prices "have [led] plaintiffs and members of the class to routinely pay more for Tillamook dairy products, as compared to national and generic brands."

Instead of accepting those allegations as true, the Court of Appeals undertook an assessment of whether plaintiffs would be able to *prove* that Tillamook's marketing allowed it to charge a premium. The court's assessment of plaintiffs' price-inflation allegations resembles the Third Circuit's analysis of a price-inflation theory in *Harnish v. Widener University School of Law*, 833 F3d 298 (3d Cir 2016). But, importantly, *Harnish* and other cases that the Court of Appeals cited involving price-inflation claims in the consumer protection context were resolved at the class-certification stage rather than the pleadings stage. *See, e.g.*, *Dzielak v. Whirlpool Corp.*, No CV 2:12-89 (KM)(JBC), 2017 WL 6513347 at *8 (DNJ Dec 20, 2017) (class certification); *In re POM Wonderful LLC*, No ML 10-02199 DDP (RZX), 2014 WL 1225184 at *3 (CD Cal Mar 25, 2014) (class certification); *Fink v. Ricoh Corp.*, 365 NJ Super 520, 553, 839 A2d 942, 964 (Law Div 2003) (class certification).[6]

_____

[6] In a footnote, the Court of Appeals cited to one case at the pleadings stage, *New Jersey Citizen Action v. Schering-Plough Corp.*, 367 NJ Super 8, 842 A2d 174 (App Div 2003). There, the New Jersey Court of Appeals concluded that the plaintiffs' price-inflation allegations were insufficient to state causation for purposes of New Jersey's Consumer Fraud Act. *Id.* at 15-16, 842 A2d at 178. That court similarly equated the plaintiffs' price-inflation allegations with the

At the class-certification stage, courts are tasked with evaluating the viability of the plaintiffs' class claims *and* the supporting evidence for those claims. *See Pearson*, 358 Or at 107 ("Establishing that the standards for class certification are satisfied under both ORCP 32 A and B is not a mere exercise in pleading. Rather, a plaintiff seeking class certification has the affirmative burden to demonstrate that the requirements of ORCP 32 are satisfied."); *cf. Harnish*, 833 F3d at 304 (explaining that, under FRCP 23, a plaintiff "may not merely propose a method of meeting Rule 23's requirements without any evidentiary support," and that "trial courts must engage in a rigorous analysis and find each of Rule 23's requirements met by a preponderance of the evidence before granting certification" (internal quotation marks and brackets omitted)). Although a trial court's class-certification determination is not a trial on the merits, "the issues that must be resolved for [the court's] determination frequently overlap with the merits of a plaintiffs' class claim." *Pearson*, 358 Or at 107-08. Thus, in making its class-certification determination, "a trial court must 'probe behind the pleadings' to the extent necessary to resolve the class claims." *Id.* at 108 (quoting *General Telephone Co. v. Falcon*, 457 US 147, 160, 102 S Ct 2364, 72 L Ed 2d 740 (1982)).

Plaintiffs' price-inflation theory of loss may well be novel, at least in the context of consumer protection statutes. And, to be abundantly clear, the problems that the Court of Appeals and other courts have perceived with applying such a theory in the context of consumer goods may well affect whether a class should be certified, to say nothing of whether plaintiffs will ultimately be able to prove their theory on the merits. In this ORCP 21 A posture, however, a court is required to assume that plaintiffs will be able to adduce evidence in support of their allegation that Tillamook's false representations had the effect of systematically inflating the prices of its goods across the market. *See Boise Cascade*

fraud-on-the-market theory, and noted that the New Jersey Supreme Court had rejected the fraud-on-the-market theory in common law fraud claims. *Id.* The court concluded that the price-inflation and fraud-on-the-market "theories have no place as a part of the proofs required of plaintiffs in the [consumer fraud] context either." *Id.* at 16, 842 A2d at 178. Based on our reasoning above, we do not find the court's analysis in that case persuasive.

*Corp. v. Board of Forestry*, 325 Or 185, 197, 935 P2d 411 (1997) ("For purposes of reviewing a motion to dismiss, we assume the truth of all well-pleaded facts alleged in the complaint and give plaintiff the benefit of all favorable inferences that may be drawn from those facts."). If they can do so, for the reasons we have explained, pleading individual reliance is not necessary to state a claim that a buyer suffered an ascertainable loss as a result of the violation.

### III.   CONCLUSION

We conclude that, for their claim alleging violations of ORS 646.608(1)(b), (d), and (e), where plaintiffs allege that they suffered ascertainable loss in the form of paying a "premium" price for Tillamook's dairy products due to Tillamook's conduct that inflated the market value of those products, plaintiffs and the class members need not plead that they relied upon Tillamook's representations. Plaintiffs' allegations that they purchased "misbranded" and "illegally advertised" goods in violation of federal and state law also do not require plaintiffs and the class members to plead reliance.

The decision of the Court of Appeals is reversed, and the case is remanded to the Court of Appeals for further proceedings.

**BALMER, S.J.,** concurring.

I agree with the majority's resolution of the important, but narrow, issue before us: Because "plaintiffs allege that they suffered ascertainable loss in the form of paying a 'premium' price" and in purchasing "misbranded" goods that were illegal to sell at all, plaintiffs were not required to plead that they or the members of their purported class relied on Tillamook's representations. 373 Or at 371. Plaintiffs presented plausible theories in support of their position that they could demonstrate ascertainable loss without alleging (or, at trial, proving) they had relied on, or even were aware of, the representations. The majority explains in detail the procedural posture of this case, but the short version is that the trial court agreed that the named plaintiffs had sufficiently alleged "ascertainable loss" and reliance on the representations as to themselves, but that their complaint

failed to state a claim for relief by members of the putative class who may have purchased Tillamook products without relying on the challenged representations. The Court of Appeals agreed, and therefore affirmed.

As the case is presented to us, we assume as true the well-pleaded allegations in the complaint, including that the representations made by Tillamook were false, either factually or in what they implied to consumers as to various characteristics of Tillamook's operations and its products, and that defendant therefore violated one or more provisions of the Unlawful Trade Practices Act. As the majority summarizes, "[p]laintiffs have alleged legal theories that do not logically require a showing of reliance on misrepresentations." 373 Or at 365.

But the majority also is careful to note that its holding "assum[es]" that plaintiffs' "illegal-product" or "prohibited-transaction" theory "is a viable theory of 'ascertainable loss,'" 373 Or at 366, and then moves on to decide that allegations of reliance on defendant's representations were not required. And it emphasizes again that the court "express[es] no view" as to whether the "illegal-product" theory "is, in fact, a viable theory of ascertainable loss under the UTPA." *Id*. Those issues were not briefed and were not before the court.

The court concludes that, accepting the allegations in the complaint as true, it was possible that Tillamook's representations regarding the characteristics of the products and of their production might have had the effect of allowing Tillamook to receive a "premium price" for its products in some circumstances. Thus, the theory did not "*as pleaded*, appear to necessitate a showing that every buyer relied on Tillamook's representations." 373 Or at 368 (emphasis in original). Of course, as the opinion makes clear, to move beyond the pleading stage, plaintiffs' premium-price theory would have to "be economically proven," *id*., a task not required in responding to Tillamook's motion to dismiss. I agree with that conclusion.

I write separately to comment on two aspects of the case: (1) what I view as potentially substantial barriers

plaintiffs are likely to face in proving their premium-price theory based on the factual allegations in this case, and the related difficulties likely to be encountered in certifying a class of purchasers, and (2) the uncertain validity of plaintiffs' illegal-product theory as applied to defendant's conduct here.

PLAINTIFFS' PREMIUM-PRICE THEORY

Plaintiffs will be required to show that the individual plaintiffs and the class members suffered "ascertainable loss of money or property, real or personal, as a result of" another person's violation of the UTPA. ORS 646.638(1).[1] Our cases do not fully define the term "ascertainable loss," although the plain terms of the statute make it clear that mental or psychological distress is not recoverable; the loss must be of "money or property," and so, at least in this case, some kind of financial loss. The required financial loss can be quite small, even "so small that the common law likely would reject it as grounds for relief," *Weigel v. Ron Tonkin Chevrolet Co.*, 298 Or 127, 136, 690 P3d 488 (1984), but it must be "capable of being discovered, observed or established," *Clark v. Eddie Bauer LLC*, 371 Or 177, 185, 532 P3d 880 (2023) (internal quotation marks omitted), and it must be "'measurable even though the precise amount of the loss is not known,'" *id.* at 193 (quoting *Weigel*, 298 Or at 136).

Here, plaintiffs argue that they have suffered ascertainable loss "measured by the premium that Tillamook purchasers pay because Tillamook's unlawful trade practices effectively have inflated the prices of its products." To prove that theory, plaintiffs will have to present expert testimony that Tillamook's marketing, through its website, advertising, and other promotional efforts caused Oregonians to believe that all (or a least most) of the milk that goes into Tillamook's products comes from cows raised and milked in Tillamook County and owned primarily (if not exclusively) by small family farms which treat the cows humanely. Those studies will be particularly challenging in this case because

---

[1] Of course, if the Attorney General wanted to challenge defendant's conduct as constituting unlawful trade practices, that office could bring a civil enforcement action based on the same allegations plaintiffs make in their complaint—and would not be required to show that any person had suffered a loss, ascertainable or otherwise, that was caused by the conduct. Those additional requirements apply only to private UTPA actions, such as this case.

much of what plaintiffs point to as false and misleading are photographs and statements that do not appear to be false or misleading on their face, but rather show or describe children raising their own cows, contented cows in green open fields in Tillamook County, and similar bucolic scenes. The pictures and wording that Tillamook uses, plaintiffs contend in their complaint, falsely project "ethical sourcing [of its products] as its company ethos, deliberately crafting its marketing messages to attract *** consumers[] who believe they are getting such responsibly sourced products when they buy Tillamook cheese and ice cream." Plaintiffs' claims thus turn primarily on the implications of their marketing, rather than on specific false statements. And what a particular person who is exposed to such advertising takes away as to whether Tillamook is representing that all of its milk comes from Tillamook County or whether the milk is of higher quality than other milk or that their cows live in much more humane and healthy settings than other cows will be primarily a *subjective* reaction by each individual. The subjective nature of those consumer perceptions will likely make it challenging to draw inferences about the effects of the advertising on the price of Tillamook products.

Experts will have to support plaintiffs' claims that the result of such marketing is that customers "are willing to pay more for [those] products [such as Tillamook's] that they perceive as being ecofriendly." That presumably will require testimony, based on marketing and pricing studies, that, as a result of the advertising and marketing, many Oregonians in fact are willing to (and do) pay more for Tillamook products than they would absent the misleading advertising, raising such prices above those of competing products that do not share the favorable characteristics customers perceive Tillamook products to have—and above what would otherwise be the market price of the Tillamook products.[2] Plaintiffs, of course, will also have to prove that Tillamook's     marketing     campaign     is     based     on

_____

[2] I agree with this court's rejection of the Court of Appeals' conclusion that plaintiffs failed to state a cause of action. However, in my view, that court's description of the potential challenges of proving their premium-price theory, when applied to the products Tillamook sells and the economics of the retail food market, seems generally accurate, and could play a role in a later stage of this case. *See Bohr v. Tillamook County Creamery Assn.*, 321 Or App 213, 243-45, 516 P3d 284 (2022).

misrepresentations about the milk that goes into its products, most of which comes from Morrow County, and about other aspects of Tillamook's production operations, and that those misrepresentations constitute unlawful trade practices. But here, we accept that those allegations are true.

It is useful to consider some prior cases to highlight the differences between them and plaintiffs' allegations here. Recall that, in each case the plaintiff had to prove that the defendant's misleading representations caused them some "ascertainable loss." And, because these cases are generally brought as class actions, the plaintiffs had to show that *all* class members suffered a qualitatively similar kind of loss, even if the amount of each person's loss might be different. In *Clark*, for example, the plaintiff would have needed to show that all purchasers who bought products at the outlet store that were advertised as marked down from a much higher "list" price—a price that, in fact, Eddie Bauer had never charged any customer—suffered ascertainable loss when they purchased the discounted product, even though they knew exactly what price they were paying and were able to examine the product they purchased and determine that they were willing to pay that price for the product. 371 Or at 180-81. Putting the merits of the *Clark* plaintiff's claims to one side, as this court did, it is nevertheless easy to see, based on the allegations in that case, exactly what the alleged misrepresentation was and the nature of the purported loss. The advertising and price tags at the outlet store clearly stated that a "Fleece Zip" had a non-sale price of $39.99, and that it was now being sold at 50 percent off, with a resulting sales price of $19.99. *Id*. at 180. Thus, the plaintiff was plainly presented with the representation that the product formerly sold for $39.99, which allowed the plaintiff to claim that she bought the jacket based on that representation (in addition to alleging that she would not have purchased the jacket if she had known that that representation was false). *Id*. at 180-83. And, although we did not address the issue of class certification in *Clark*, it was apparent that each buyer of a Fleece Zip at the outlet store was presented with the same representation that the product formerly sold for $39.99, which would allow each to claim that they would not have purchased the product if they had

known the representation was false. *See id.* at 199 (concluding that ascertainable loss is established when buyer can show that they would not have purchased garments had the defendants not misrepresented price history).

Compare the clear, objective nature of the alleged price misrepresentation and amount of possible loss in *Clark* with this case, where the entire set of representations only *imply* certain characteristics regarding Tillamook's milk and production practices. It appears to me that the inferences that a purchaser exposed to the marketing draws as to Tillamook's products and practices are essentially subjective and likely to vary substantially among the thousands of consumers who saw those representations and based their purchasing decisions on them.[3] I understand, of course, that plaintiffs' theory does not require that each consumer have seen the representations, and that the claimed "premium" price is based on the market-wide impact of the representations. But that impact nevertheless turns on whether a large number of individual purchasers of Tillamook products perceive, because of the company's marketing, that those products are worth more because they are produced by contented cows in verdant Tillamook County settings. Economists, pollsters, and market analysts can be quite creative, but it may be difficult to sort out the various reasons the products might command a premium price: Did some consumers believe the products tasted better, based on their prior consumption of the products? Did others like the idea of purchasing the company's products because they were sourced in Oregon, whether in Tillamook County or Morrow County?[4] Another contrast with *Clark*, of course, is the nature of the retail food market, where almost all of Tillamook's products are sold to customers at two or three levels removed from the company itself, with store prices

---

[3] As noted, plaintiffs here allege in their complaint that the price premium consumers allegedly pay for Tillamook products is because they "perceive" the products to be "ecofriendly" in some way.

[4] For those and other reasons noted by the Court of Appeals, it is questionable whether a study could be done that would meet the standards of statistical confidence that would permit an expert to provide the testimony that plaintiffs will need. A related question is whether plaintiffs would consider even the use of the name "Tillamook" to be an unlawful trade practice, if applied to products not sourced in that county, although one hopes that would be a bridge too far.

being set individually by thousands of retail sellers, based on the many different cost and competitive forces that each of them faces. The Eddie Bauer products, on the other hand, were all sold directly by Eddie Bauer, in Eddie Bauer stores, at prices set by Eddie Bauer.

Similarly objective and straightforward were the facts underlying the fact and the amount of the "ascertainable loss" suffered by plaintiffs and class members in *Scharfstein v. BP West Coast Products, LLC*, 292 Or App 69, 423 P3d 757, *rev den*, 363 Or 815 (2018), *cert dismissed*, __ US __, 140 S Ct 16 (2019). Service stations owned by BP charged a 35-cent fee for using a debit card, but failed to disclose the fee on most of its price advertising or on the gas pump price itself. *Id.* at 72. As in *Clark*—and unlike in this case—each customer using a debit card faced the same failure by BP to disclose the fee and suffered exactly the same kind of financial loss, the amount of which was never in dispute. *Id.* at 72-73. Although gas prices varied among the BP locations and those stations competed with other brands, the loss was obvious, was based on BP's policies regarding the fee and its price advertising, and was identical for every debit card user. *See id.* There was no question of any customer's *subjective* views regarding the undisclosed fee or the fact or amount of the losses they incurred.

*Amicus curiae* Oregon Department of Justice cites a federal case from California in support of its contention that the Court of Appeals set the "ascertainable loss" standard too high in this case. But that case, *Brown v. Hain Celestial Group, Inc.*, No C 11-03082 LB, 2014 WL 6483216 (ND Cal Nov 18, 2014), again highlights the challenges I think plaintiffs will face in the next stage of this litigation. *Brown* was a class action brought by purchasers of cosmetics, some of which were sold under the brand name "Avalon Organics" and others with the printed tagline "Pure, Natural & Organic." *Id.* at *1-2. In fact, the various products contained very few organic ingredients, in some cases less than 30 percent by weight or volume. *Id.* at *2-3. The federal district court certified the case as a class action, based in part on a "price-premium" theory similar to that offered by plaintiffs here. *Id.* at *18. But consider the differences. First, the

alleged representation was a single, specific, unambiguous statement of fact that the products were "organic," which the plaintiffs understood to mean entirely or mostly composed of organic ingredients. *Id.* at *2. That labeling alone, if false, was a violation of federal and California statutes not relevant here. *Id.* And while individuals might differ in their interpretation of "organic," there are widely known and used standards for that term, as well as specific legal requirements. Second, each buyer who bought the product could not help but see the false factual statement on the front of each bottle purchased. *Id.* at *2-3. There was no need to rely on any subjective understanding or perception on the part of any class member. Of course, as the trial court pointed out, for some buyers the fact that the product was branded as "organic" may have mattered and for some it may not, but the court understood that the "price-premium" theory did not require reliance. *Id.* at *18. Summing up whether a class of purchasers should be certified, the court stated, "The plaintiffs' claims against [the defendant] are simple and uniform: the products were presented as organic when, under the [California Organic Products Act], they were not." *Id.* at *14.

Even with the relatively straightforward nature of the *Brown* case, at the class-certification stage, the court carefully reviewed declarations from the expert witnesses for each side, including the plaintiffs' models for later calculation of the "price premium" and the defendant's challenges to those models. The court concluded that the plaintiffs had "plausibly shown that damages can be calculated on a class-wide basis," although no actual calculations had yet been done. *Id.* at *20. The admissibility of economic expert testimony would be an issue for a later time, the court found, but the plaintiffs' showing was sufficient to support the court's decision to certify the class. *Id.* at *18-20.

The cases discussed above are illustrative of others from various jurisdictions applying UTPA-like claims in class action contexts. Those cases suggest the relatively low bar many (but not all) courts have set for stating a claim for relief by private plaintiffs seeking damages for losses suffered because of misleading advertising. But the cases that

have moved beyond the pleading stage to class certification or to merits challenges to the allegations of "ascertainable loss" (or the analogous standards for private plaintiffs to recover damages under other state statutes) tend to be quite different from this case. As the court's opinion here makes clear, at the class-certification stage, the trial court will be required to "probe behind the pleadings to the extent necessary to resolve the class claims." 373 Or at 370 (internal quotation marks omitted). At that stage, "courts are tasked with evaluating the viability of the plaintiffs' class claims *and* the supporting evidence for those claims." *Id*. (emphasis in original); *see generally id*. It is certainly possible that plaintiffs' claims regarding the falsity of Tillamook's marketing, the effect of the false aspects of that marketing on consumers' perceptions of the products, and the impact of those perceptions on pricing of Tillamook products can be demonstrated by expert testimony. But the cases where classes have been certified and consumers have successfully demonstrated financial injury as a result of a seller's unlawful trade practices generally have involved more objective misrepresentations and a more direct and straightforward impact on prices and consumer purchasing decisions.

## PLAINTIFFS' ILLEGAL-PRODUCT THEORY

Plaintiffs' illegal-product theory claims that, because of its UTPA violations, it was unlawful for Tillamook to sell any of its milk-based products in Oregon. Plaintiffs are bringing their action pursuant to ORS 646.638, which allows for private civil actions based on UTPA violations. As we have explained, the UTPA is enforceable both by private parties and public prosecuting attorneys. *State ex rel Rosenblum v. Living Essentials, LLC*, 371 Or 23, 26, 529 P3d 939 (2023) (citing ORS 646.638 (governing private civil actions) and ORS 646.632 (governing public enforcement actions)). The two types of actions differ in the elements to be proved and the burdens of proof. *State ex rel Redden v. Discount Fabrics*, 289 Or 375, 384-86, 615 P2d 1034 (1980). "Ascertainable loss" is an element of a private civil action, but not of a public enforcement action. In addition, public enforcement actions include a requirement that a prosecuting attorney file notice of an intent to bring a suit and an opportunity for voluntary

compliance. ORS 646.632(2) (establishing requirement); ORS 646.632(5), (6) (establishing exceptions to the requirement).

As I understand it, plaintiffs' illegal-product theory is that (1) Tillamook's advertising violated the UTPA; (2) therefore, Tillamook's products were illegal and should not have been on the market; (3) therefore, plaintiffs suffered an ascertainable loss when they purchased Tillamook's products; and (4) the amount of the ascertainable loss is the purchase price. Thus, it appears that, under plaintiffs' theory, plaintiffs could establish an ascertainable loss resulting from a UTPA violation regardless of whether the violation had any effect on their understanding of a product's characteristics, their decision to purchase the product, the price of the product, or their satisfaction with the product. Under plaintiffs' theory, "ascertainable loss" could exist absent any economic harm or damage to them, as those terms are commonly understood. Moreover, the "ascertainable loss" would be the purchase price of the product, as this case illustrates, because plaintiffs now seek to recover from Tillamook the entire amount of all Oregon retail sales of all Tillamook products during the limitations period. I question whether, when the legislature created separate, different mechanisms for private civil actions and public enforcement actions for UTPA violations, it would have intended the former to be so broad as to allow private actions on a theory like that presented here. As noted, that issue was not briefed or argued in this court. There may be legislative history or other grounds supporting plaintiffs' reading of the statute, but it is not apparent from the text or structure of the statute.

Although I concur in the majority's conclusion that the illegal-product theory does not require reliance, it is worth emphasizing that the majority's decision should not be taken to mean that the theory is a viable one on the facts alleged here.